Robertson *against* Robertson.

In all cases of fraud, and when the transaction in relation to the purchase of land has been carried on *mala fide*, there is a resulting trust by operation of law; but unless there be something in the transaction more than is implied from the mere violation of a parol agreement, equity will not decree the purchaser to be a trustee.

*Quere.* If an action of ejectment be brought for the undivided moiety of a tract of land, whether a verdict and judgment for any portion of it in severalty would be good?

ERROR to the court of common pleas of *Allegheny* county.

Richard Robertson against John Robertson. Ejectment for the undivided half of a tract of land containing 151 acres. This case involved a construction of the statute of frauds and perjuries, and depended upon parol testimony of the acts, declarations and conduct of the parties, so voluminous as to be beyond the limits of a report; the material facts, however, are accurately stated in the opinion of the court. The cause was argued by

*Lowrie* and *Foster* for plaintiff in error, who cited 2 *Watts* 324; 5 *Watts* 390; 6 *Watts* 464.

*Irwin* and *Mahon, contra,* cited 4 *Eng. Con. Cha. Rep.* 320; 2 *Serg. & Rawle* 461; 1 *Dal.* 427; 3 *Bin.* 302; 1 *Rawle* 408; 8 *Serg. & Rawle* 484.

The opinion of the court was delivered by

ROGERS J.—Sometime in the year 1806 or 1807, James Robertson, who was the father of the parties, took possession of the land in dispute. The land had been previously sold, by an article of agreement, to John Denning. Robertson took possession of the land, under Denning, subject to certain terms and conditions. Astley and Gibson were the owners of the legal title. James Robertson continued in possession of the tract for several years, and becoming indebted, his interest was sold under a judgment against him by the sheriff, and a deed by the sheriff to Joseph Barcley, who purchased the property for Hugh Robertson, was acknowledged on the 19th of November, 1829. In consideration of 72 dollars, Joseph Barcley conveyed to Hugh Robertson. Before the purchase of the property at sheriff's sale, John Robertson, the present defendant, and Hugh Robertson, his brother, entered into an article of agreement, by which, in consideration of 72 dollars, Hugh Robertson

[Robertson v. Robertson.]

stipulated to make over to John Robertson, on the payment of his note, and any other costs, that may accrue in the procuring of the same, his interest in the land purchased at the sheriff's sale, with the understanding, that in making the deed, the property was to remain to the use of their parents, if they think proper to reside thereon, as long as they live.

This contract has been fully complied with by John, as appears by the testimony of Hugh Robertson, the other contracting party.

Richard Robertson, the present plaintiff, on the 15th of September 1832, entered into an article of agreement with his brother John, (the defendant,) by which John grants to Richard twenty-five acres of the northeast corner, including the run, on which the old school house now stands, to have and to hold the same, during the natural life of Richard. The consideration was the sum of one dollar, and appears, from the testimony of Hugh Robertson, was an act of charity and brotherly kindness on the part of John to his brother Richard, who was poor and sickly. The situation in which the plaintiff and defendant then stood was, that John had an equitable title, or fee simple to the whole tract, subject to the life estate of Richard, in twenty-five acres, and also subject to the payment of the unpaid purchase money, due to Messrs. Astley & Gibson, the owners of the legal title, on their article of agreement with Denning, under whom both plaintiff and defendant must claim.

The plaintiff and defendant took possession of the property, Richard of twenty-five acres, and John of the residue of the tract, and made improvements thereon, until the 7th of November 1835, when Thomas Astley, to whom a patent was granted on the 18th of April 1832, instituted an action of ejectment, against the tenants in possession; viz., Richard and John, which, on trial, the 17th of May 1836, resulted in a verdict and judgment in favor of the plaintiff. On an *alias haberi facias possessionem*, to the 7th of April 1839, possession was delivered to Thomas Astley.

On the 28th of September 1836, in consideration of 3066 dollars, Thomas Astley conveys the property, as described in the patent, to John Robertson.

John Robertson, then, is the owner of the legal title to the whole tract, and the owner of the legal and equitable title, subject to a life interest, in Richard, of twenty-five acres, pursuant to the agreement.

The ejectment is brought by Richard, to recover from John, who is in possession of the whole tract, an undivided half of a tract of land, containing one hundred and fifty-one acres, &c. That is to say, he claims one half of what remains, after the conveyances of the land, which were sold to raise the means of discharging the claims of Mr. Astley.

The plaintiff claims the possession, on the ground of a parol contract, payment of the whole or part of the purchase money, and a possession taken of the property in pursuance of the contract. In

IX.—D

[Robertson v. Robertson.]

this stage of the proceedings, it is necessary to correct a mistake, into which the court seem to have fallen, and which pervaded the argument of the counsel throughout. The allegation on the part of the plaintiff, say the court, necessarily involves a gross fraud on the part of the defendant. If the plaintiff recovers, it can only be by the establishment of such an imputation. As I understand the testimony, there is no more fraud here, than what is implied in every breach of contract. And that, as has been repeatedly held, is not such a fraud, as takes a case out of the statute. It does not constitute John Robertson such a trustee as to let in parol proof of the contract; for there is not that *mala fides*, from which, in England, and in this country, a trust results by operation of law. The act of frauds and perjuries of this state, does not prevent a declaration of trust from being made by parol. And in the Lessee of German and Others *v.* Gabbald, 3 *Bin.* 302, it is said that our statute applies to legal estate rather than to trusts, and that as our act does not comprehend the case of trusts, there is nothing to prevent parol proof of any thing by which a trust may be inferred. Although the expressions of the chief justice are very general, yet in all the cases which have been decided, there have been other circumstances, besides the refusal to perform the contract, to induce the court to hold the purchaser a trustee. Thus, the case of the Lessee of Thompson and Wife *v.* White, 1 *Dall.* 447, was a case of fraud, and would have been relieved against in England. Stewart *v.* Brown, 2 *Serg. & Rawle* 461, was a case where the plaintiff and defendant were tenants in common of a tract of land which was afterwards sold for taxes, and the defendant became the purchaser. The purchase was made under an agreement that each should be one half concerned in the purchase. It was decided that the defendant was a trustee for the plaintiff, but here the plaintiff had a previous interest in the land, and moreover, as they were tenants in common before, the purchase enured to the benefit of the plaintiff. It cannot be supposed that the court intended to lay down the distinct proposition, that where a person purchased a tract of land for another, and paid his money for it, the court would decree him to be a trustee upon proof of a parol contract, that they should be joint purchasers. For this would be repealing the act of fraud and perjuries, under the pretence of preventing frauds. The case of Peebles *v.* Reeding, 8 *Serg. & Rawle* 484, has also been cited, where lands were sold under an execution. It was decided that parol evidence may be given of the declaration of the purchaser that he was buying for the former owner. It may be remarked, that this opinion was not necessarily called for, and the cause was with the defendant, who was an innocent purchaser, on another ground. There is some difficulty in understanding the grounds on which the judge, who delivered the opinion, placed this part of the case. He says, if by the artifice of the purchaser, declaring he was to buy for the

[Robertson v. Robertson.]

owner, others were prevented from bidding, and the land was sold at a great undervalue, this would make him a trustee. He cites with approbation, Botsford *v.* Burr, 2 *Johns. Chan. Rep.* 405, where it was held, that one who sets up such a trust, on the sale of his property on a mortgage, unless he has paid part of the consideration money, will not be allowed to show, by parol, that the purchase was made for his benefit. He then adds the qualification, that this may be different, when it appears that there has been any artifice on the part of the purchaser. He does not seem to controvert the position, which is undeniable in England under the statute of 29 Car. 2, that, if a man merely employs another by parol, as his agent, to buy an estate for him, and the agent buys it and pays for it with his own money, and takes the conveyance in his own name, it would be in the very teeth of the statute to decree this a resulting trust. But I cannot, at any rate believe, that, at this day, under the testimony in that cause, when in truth there was no contract whatever, except what might be inferred from the declarations of the purchaser, he would be declared a trustee to the former owner. The authority of Reeding *v.* Peebles, has been much doubted, and particularly in Kisler *v.* Kisler, 2 *Watts* 323. In the latter case, it is ruled that specific cases of resulting trusts are two. The first, where the purchaser has paid the price with his own money, but taken the conveyance in the name of another; not where he has paid with the money of another, and taken the conveyance in his own name; and secondly, where a trust has been declared of but part of the estate from which the law implies an intent to reserve the beneficial ownership of the residue. It is held that a purchase of land by a guardian, which he declared at the time, to be for the use of his ward, is not such a trust as can be enforced by the ward, but is within the provisions of the statute of frauds and perjuries. In noting the case of Peebles *v.* Reeding, the court say that it is a case like the present, except that the party claiming the trust had been the owner of the land, and that it was there held it was no resulting trust; but it seemed to have been thought that it was no express trust by force of the undertaking to purchase and convey; yet the judge who delivered the opinion of the court at the same time considered the supposed *cestui trust* as an ordinary purchaser, affected by delay in seeking an execution of the contract, which he could not be, if he were the beneficiary owner of the equitable title. It is not easy to reconcile all the positions taken in that case, and certainly that of Kisler *v.* Kisler cannot be reconciled with Reeding *v.* Peebles. The same matter is also noticed in Sidle *v.* Walters, 5 *Watts* 391. It is there said, that, where a man declares publicly, that he purchased for another without any previous agreement, or without any advance of money, this is not such a transaction as raises a trust which can be enforced in equity. In Kisler *v.* Kisler, it is said, "If I proclaim that I hold my house for B, on terms of con-

[Robertson v. Robertson.]

veying it to him when he shall reimburse me what I paid for it," this is not a trust, but a contract of sale with the operation of the prohibitory clause.   So if A enters into a parol contract with B, to purchase a house for B, this is a contract and not a trust, and is within the acts of fraud and perjuries.   To the same effect is the case of Flamin *v.* Sproul, 2 *Marshall* 56.   The exceptions to this are such as Thompson's Lessee *v.* White, which was a case of plain and palpable fraud, and Stewart *v.* Browne, 2 *Serg. & Rawle* 461, where there was a previous interest, and where the violation of the parol agreement would be a fraud, or where as in Browne *v.* Dysenger, 1 *Rawle* 413, he was enabled to purchase the property at an undervalue, in consequence of his representations at the sale, that he was purchasing the property for the former owner.   To the same class may also be referred   Lees *v.* Nuttall, *Russell & Mylne* 53; 4 *Cond. Ch. Rep.* 320.

These are all exceptions to the general rule.   In all cases of fraud, and where transactions have been carried on *mala fide*, there is a resulting trust by operation of law, but unless there be something in the transaction more than is implied from the violation of a parol agreement, equity will not decree the purchaser to be a trustee.   And this distinction is indispensable, otherwise there would be a repeal of the statute, under the pretence of preventing fraud by decreeing an express trust, which would be introductive of the very evils the statute was designed to prevent.   There is a want of precision in the language of some of the cases, and particularly in Peebles *v.* Reeding, which has given rise to an idea that it was only necessary to call it a trust or to allege fraud so as to introduce parol evidence.   But the latter decisions have repudiated this idea, and have brought back the construction of the act to its proper basis.   In this case there is nothing to show an express trust; no trick, or artifice, on the part of the defendant, nor, except as respects the 25 acres, was there any previous title in the plaintiff to any part or parcel of the premises, for which the ejectment is brought.   This case must then be considered as embraced within the act of frauds and perjuries, which enacts, " that no estates or interest, either of freehold, or for a term of years, of or in any messuage or lands, &c., shall be assigned, granted, or surrendered, unless by deed, or will, or writing, signed by the parties so assigning, granting, or surrendering the same, or their agents, thereunto lawfully authorised by writing, or by act or operation of law."   It is not pretended there was any writing between the parties, nor that John was a trustee by act and operation of law; nor does it, as it is seen, come within that class of cases, which may be denominated express trusts.   But the plaintiff alleges a parol contract between himself and the defendant, by which it was agreed that they should be equally gainers and losers, in the event of the action of ejectment, instituted by Thomas Astley against them; that is to say, that Richard was to pay one half the costs, if the verdict

[Robertson v. Robertson.]

should be against them, and should be entitled to one half the land for which the ejectment was brought, in the event of a verdict in their favour; that in pursuance of such contract, Richard actively participated in the defence, and assisted in making the compromise with the plaintiff, and assisted in raising the means of carrying the compromise into effect. It is not pretended, that there was any direct or positive proof of these allegations, but it is so inferred from circumstances, and from the acts and declarations of the defendant. The greater part of the plaintiff's testimony is confined to proof of the participation of Richard in the defence of the action of ejectment, to the payment of a few dollars to a witness, and to his interference in promoting the compromise, as it has been called, between Mr. Astley and his brother John. Supposing all this to be true, to the extent claimed by the most strenuous advocates of Richard, yet I am at a loss to conceive what weight ought to be attached to it. In my judgment, it ought not to weigh a feather in the scale. It must be remembered, that Richard was a co-defendant in the action of ejectment, that he had an interest during life in 25 acres, which, by the bye, he acquired from the bounty of John. What then did *he* do, that he was not legally bound to do, or what was not required from him, by a prudent regard to his own interest. It will not be disputed, that he was legally bound for one half the costs, in case of a failure in the action, and surely he can claim no merit for using the ordinary means of defending his possession, and protecting the interest which he had to the extent of 25 acres. Nor can I perceive, for the same reason, that he can derive the slightest shadow of equity from any exertions of his, in effecting the compromise. But these are the considerations, moving from Richard to John, which they say induced John to enter into the parol contract, which has been so strenuously insisted on by the plaintiff. If the case required it, it might be seriously doubted, whether, granting all that has been stated, the alleged contract is not *nudum pactum.* Richard has done nothing more than he was legally compelled to do, or which a proper regard to his own interest, might induce him to do. He has paid no part of the purchase-money, (even admitting that the subsequent sale of part of the premises, was a payment by him, which is assuming the very matter that was in issue, to be true,) until after the alleged bargain: but payment of money, after a purchase has been completed, will not raise a resulting trust. Bettlesford *v.* Burn, 2 *Johns. C. R.* 414. It has been contended that some equity arises to Richard, from the conveyance to John, being the result of strong representations made to Mr Astley, in behalf of the family. It is very evident, that Mr Astley supposed that the premises were occupied, for the benefit of the family of old James Robertson, the father of the parties; and what peculiar equity can be derived from that circumstance, except in common with the others of the family, and particularly, the deaf and dumb sister, who it appears is now liv-

IX—D*

ing with, and is supported by John, it is difficult to imagine. "In clearing the tract," says John, in his letter to Mr Astley, "there has been spent the labour of my late father, during the best years of his life, and of my brother, and myself. The manner of our clearing has been such as not to make an immediate profit out of the land, but to lead to its permanent advantage. We have got, therefore, little or nothing out of the land for our toil." He also speaks of the desperate condition of the family in the woods: the name of Richard does not occur throughout the letter, nor for ought that appears, was it known to Mr Astley that any other was the defendant in the ejectment, except John. "We were told," says John, "by our dying father, that the land was his. He left it as a support to a large family; amongst others a sister of ours, born deaf and dumb, who is now, and ever must remain a charge and burthen. And, we to be prosecuted as out-laws, because we did not at the first summons abandon our paternal home, and send our sister to the poor house." The appeal is made for the family, and certainly was not intended for the peculiar benefit of Richard, even if there were considerations, which could legitimately enter into the decision of the cause. Had Mr Astley been informed of all the facts of this cause, what is there in it, which could excite his peculiar sympathy for Richard? Absolutely nothing. Richard was a single man; had been in the possession of 25 acres, derived from the bounty of John. All his labour had been expended on his own improvement, whereas John had supported his sister, and had improved the remainder of the tract besides having paid for the land to his brother Hugh. If these things had been represented to Mr Astley would his sense of justice have induced him to take the property from John, and give it to Richard? Would he not have supposed that all that Richard could justly require, was his original 25 acres, on the terms and conditions of his agreement with John? But Mr Astley, did not undertake to divest the beneficiary interest in the tract. By his agent, Mr Metcalf, he made the deed to John, leaving of course, the rights of the parties to be determined by themselves, and by the operation of law: Besides, could Mr Astley have done so? Without the wish to detract from the generosity of Mr Astley, it may perhaps be doubted, whether John and Richard had not a right to call for the conveyance of the legal title, upon payment of the arrears due upon the Denning article. The evidence shows, that they held under that article, and that it was upon that fact a recovery was had. They had a right to say, if you insist upon the article, the jury should find a conditional verdict, ascertaining the amount due, and prescribing such other equitable terms and conditions, as the court and jury, under the circumstances, may think right. And, perhaps, even after an absolute judgment, the court would have stayed the execution, upon tender of the money, or they might have recovered the land in an ejectment, on equitable terms. Nor, would they have been pre-

[Robertson v. Robertson.]

cluded from this, by the defendants setting up a title, to the land, as settlers, as they do not forfeit their equitable title, because they insisted upon what they believed to be a superior legal title. The assertion of a written agreement, by a plaintiff in ejectment, by which he claims title, does not estop him from asserting another, and an independent title resting on parol. M'Reynolds *v.* M'Cord, 6 *Watts*, 288. The doctrine of forfeiture does not apply to a case of this kind, but to the relation which subsists between landlord and tenant. But be this as it may, I cannot feel the force of the equity which has been claimed for Richard, arising from the letter of John, to Mr Astley, and the deed subsequently made to John by his agent in pursuance of it. To prove the parol contract, much stress has been laid upon the testimony of Mr Metcalf, Mr Alston, Mr Redpath, and particularly John Emerick. Emerick says, that John asked his opinion respecting the suit between him and Astley. He said it depended upon whether the article was found. He asked him under what circumstances do you and Richard stand or claim? He said, Richard and I are halvers; stand, or fall, win or lose, we are halvers!

Without the slightest intention of attributing to the witness a wilful and deliberate falsehood, it may be observed, that when a witness is favorably inclined, from either past or expected services, how easy it is, to be mistaken in the report of a conversation, held some time before, imperfectly heard and remembered, if not purposely misrepresented. Such testimony has less force, when there was another person in company who did not hear it. That part of the testimony of Alston, in which he spoke of the substance of the conversation with John, was not evidence, and of course was entitled to no weight whatever. Mr Metcalf says, " that as he was leaving Mr Watts's office, to go and write the title, it occurred to him whether he should make the title to one or both the Robertsons. He turned back; both present. He looked to John, and asked him how he should make the title. Shall I make it to one or both of you? John seemed to hesitate. He remarked this, as they were going immediately to transfer it, it might be more convenient to make the title to one than both of them. John said, that perhaps it would be as well to make it to him. He looked at Richard when he made the remark. He saw Richard nod assentingly." Mr Metcalf corrects his testimony the next day, by saying, ",That it is possible that he may not have made the remark as to the deed being made to one being a convenience. That he may have confounded what was said, in relation to this remark, with a conversation he afterwards had with Richard." And this of itself, shows the uncertainty of human testimony, and it may account for the testimony of Emerick, who may have confounded a conversation, mistakingly attributing it to Richard: and how cautious we should be in the investigation of it.

Redpath, who was present, does not speak of any such remark

being made, nor did he notice any hesitation in John's manner nor in Richard's, when it was said the deed was to be made to John. He says Metcalf turned round, and asked to whom the deed was to be made, and one of the Robertsons (he thinks John) replied, to John Robertson. It is, I think, most probable, that Mr Metcalf was mistaken in his recollection, for it is difficult to understand the conveniences that would arise from making the title to John, when it was intended to sell only a part, and not the whole of the premises. It would have been equally as convenient, if not more so, to have made the title to both, as they were both present, provided they were the joint owners of the property.

But admitting the full force of this testimony, we may readily suppose there would be some hesitation in the minds of both as to the manner in which the title should be made, when it is recollected that Richard was entitled to a life estate in 25 acres, and John was the owner of the residue of the tract in fee. Redpath's testimony has relation to the fact of possession, within the contract, and will be mentioned hereafter. Much proof has been adduced, in relation to the various regulations for the sale of the property; of Richard's opposition to a sale, of the declaration made by both, that it was necessary for them to raise the means of discharging the claims against the estate, &c., of the exertions of Richard for that purpose. But it must be remembered, that at one time, the intention was to sell the whole tract, which could not be done without the assent of Richard, who was entitled to an estate for life in 25 acres. John respected the rights of his brother, and was unwilling at that time, in any way, to interfere with them. Taken in connection with that fact, a degree of importance has been attached to this part of the testimony, which it by no means merits. If this case was to be decided wholly on the plaintiff's testimony, I should have no hesitation in saying, that it was altogether insufficient to justify the jury in their conclusion that there had been such proof of a parol contract, as would take the case out of the operation of the act. This part of the case depends upon a supposed bargain between John and Richard. That there should have been such a contract, is highly improbable, because it is difficult to believe in the excess of generosity on the part of John, by which he would be induced to part with a large portion of his estate, without any consideration whatever. But even admitting the allegation of Richard, that the contract was to depend upon the event of the suit with Mr Astley, it was only in case of success, that they were to be joint owners of the estate. But they were not successful, and the contract, if any such there was, was at an end. The event had shown that neither had any title to the land, and it was necessary to repurchase the property.

In a case like this, we have a right to expect some consistency in Richard in asserting the grounds of his claims. At one time he asserts a right, on the footing of a written agreement between him

[Robertson v. Robertson.]

and John, which was doubtless the agreement for the 25 acres. At another, he claimed 50 acres, in consequence of his buying a partnership in the Astley suit; sometimes, he said he had an equal right with John to the property, on account of the trouble he had had in the suits with Mr Astley, not alleging there was any contract. A fourth time, he claimed as one of the heirs of his father, James Robertson. He also proposed to give John 14 dollars per acre for 50 acres. In the middle of February 1837, he offered to sell his life estate in the 25 acres, to his brother, Stewart Robertson, for 250 dollars. This was after the purchase from Mr Astley. The same witness also states, that he demanded a share of the overplus land, as one of the heirs of his father, James Robertson. These allegations are entirely at war with his present pretensions, in almost every particular. It leads irresistibly to the inference that his claim does not arise out of contract, but it is a phantom of his brain, conjured up from an imaginary equity, arising from the trouble to which he was put in the action of ejectment with Astley, and the part he took in effecting the settlement.

To substantiate the claim, it is necessary to show, in addition to parol contracts, that possession was delivered in pursuance of the contract. It is not sufficient to take the case out of the act, that there was a payment of part, or even the whole of the purchase money, as has been decided at this term, in the case of M'Kee v. Snyder. So that even conceding, what was by no means proved, that Richard paid part of the purchase-money, that does not entitle him to the land, unless his case has in it another essential ingredient, viz., possession delivered in pursuance of the contract. And here let me remark, that I cannot assent to the correctness of that part of the charge, in which it is said, that if the parol contract be proved to the satisfaction of the jury, the proceeds of sale of part of the tract embraced by the contract, would necessarily, under the contract, belong to both John and Richard, and the payment out of those proceeds, would be a payment of both. If the payment of part, or the whole of the purchase-money, is to have any effect, it should be a payment, independent of money arising from the sale of the premises itself; for otherwise, the evidence amounts to nothing more than proof of the contract, and from that assuming the payment of the money. It is taking as proved the matter in dispute, and from thence, inferring evidence of a distinct and independent fact.

But taking for granted that the parol contract has been proved, and that there has been a payment of part of the purchase-money; still, an essential ingredient is wanting, that is, proof that exclusive possession was taken in pursuance of the contract. It must be remembered, that the suit has been brought, and recovery had, for an undivided moiety of 150 acres, the residue of the tract, after the sale, for the payment of part of the purchase-money. Now there is no proof, that the possession of Richard was extended beyond

[Robertson v. Robertson.]

the 25 acres, except what may be collected from the testimony of Redpath, who testifies that Watfield wanted to purchase more than John Robertson wanted to sell. John Robinson said, he would not sell any more than he was offering. John Robinson pointed to a small draft, on the ground; here, said he, are the old improvements; and pointing to another part, here, said he, is Richard's part; and if I sell any more, I will have to go on Richard's part, which I cannot or will not do. It would be dangerous to extend this evidence further, than as a mere designation of the boundaries of the tracts, as held by the respective owners, under the improvements, and according to the agreement. There is no reference to any contract, nor to any supposed possession taken in pursuance of the contract. In Haslett *v.* Haslett, 6 *Watts* 464, it is held, that an exclusive possession is an indispensable ingredient, in the case for a specific performance of a parol contract, to the sale of land. It is not alone sufficient, for the party claiming the benefit of a parol contract to prove that he is in possession of the premises, but in addition to distinct and satisfactory proof, of the contract, he must prove most clearly, that he took the exclusive possession in consequence and in pursuance of the contract. Of this latter requisite there should not be a shadow of doubt resting upon the mind of either court or jury. Here then is no pretence, that he ever had his boundaries fixed or ascertained, except as respects the 25 acres, or that he ever took the exclusive possession of any part of the tract beyond those boundaries. In order to make the acts such as a court of equity will deem part performance of a contract within the statute, it is essential that it should clearly appear to be done solely with a view to the contracts being performed. For if they are acts which might have been done with other views, they will not take the case out of the statute. 1 *Johns. Cha. Rep.* 149, 283, 284, 285; 1 *Fonbl.* book 1, ch. 1, sect. 3, note 8 (*e* ) In 2 *Johns. Cha. Rep.* 412, it is said, and to the truth of the remark we all subscribe, that declarations of parties are the most unsatisfactory species of evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides the slightest mistakes, or failure of recollection, may totally alter the effect of the declaration. The truth of these remarks was never more applicable than to this case. As in Hastill *v.* Hastill, we think it was the duty of the court, whilst they disclaimed all intention of dictating to the jury, as to the credibility of the witnesses, to have charged them, that the plaintiff had not made out a case in which a chancellor would decree a specific execution. In the opinion of this court, there is no case which calls for a more firm administration of the law, than when a party seeks to enforce a parol contract for the sale of land.

The preceding remarks have been made, as to the claim to a moiety of the tract. The title to the 25 acres rests upon other principles. The article of agreement of the 15th Sept. 1832, may

[Robertson v. Robertson.]

be construed, as containing a covenant for a further assurance for an estate, for the life of Richard, in the 25 acres. And if this be so, a court of chancery would compel John to convey to Richard, he having purchased the legal title from Mr Astley. When a man conveys land to which he has no title, but afterwards acquires title to it, he will not be permitted to claim in opposition to his deed to the grantor, or any person claiming under him. Brown *v.* M'Cormick, 6 *Watts* 60. This view of the case would exempt Richard from payment of any part of the money which John had to pay for effecting the compromise with Mr Astley, and would get rid of the objection, that Richard had not tendered to John his proportion of the money, paid by the defendant. If, however, the plaintiff chooses to place his cause upon the parol contract, as to the whole or the 25 acres, he can only recover upon payment of his proportion of the money paid, and properly securing John for his proportion of the obligations, which the defendant has given for account of the outstanding purchase-money.

It is also the opinion of the court that a tender should be made before the commencement of the suit. The court of common pleas put the case upon the ground of actual fraud, and based their opinion upon cases decided on those grounds, which is not applicable here, as it has been seen that here there is no fraud except that fraud which may be inferred from the breach of a parol agreement.

In conclusion, it may perhaps be worthy of some attention, whether, in a suit for an undivided moiety, a portion of the tract may be recovered in severalty. On this point, we do not express any opinion.

Judgment reversed and a *venire de novo* awarded.