## Woods *against* Farmare.

He who claims to recover land upon the evidence of a parol contract of purchase, will be held to full, complete, satisfactory and indubitable proof, of what the contract was; what land he purchased; its boundaries; what the consideration was; that it was paid; and that possession was delivered in pursuance of the contract. Without such proof the statute of frauds and perjuries will bar a recovery.

ERROR to the district court of *Allegheny* county.

James Woods against John Farmare and Robert Davis. Ejectment for a lot No. 200, containing 10 acres in the reserve tract.

The title to the lot of land in dispute, was vested in John Woods, the father of the plaintiff, by patent dated the 28th March 1814, and both parties claimed under this title. The plaintiff's title was founded upon an alleged parol sale of the land by his father to him, in the year 1815; to support which, he gave in evidence an article of agreement between John Woods, his father, and William Carson, dated in April 1817, and a deed in pursuance thereof, dated 4th April 1818, conveying an adjoining lot to William Carson, in both of which John Woods describes the lot sold, as " adjoining James Woods, thence north 15 degrees, west 124 perches, by lands of James Woods," &c. This was given for the purpose of showing the acknowledgment of John Woods, that he had previously sold

[Woods v. Farmare.]

the lot in dispute to his son, James Woods, the plaintiff. The plaintiff then called several witnesses, who testified as follows:—

William Carson, sworn.—I know the land in dispute. It adjoined land I purchased from John Woods. I always understood from John Woods that that was land of James's; but I cannot state the particular words used in speaking of it. When I bought from him, there was a cabin on this lot, in which Mrs Gray lived, a sister of plaintiff's. There was a piece of fence built; don't know who built it; James claimed it as his own. I cleared up to it on my boundary. Did not see the fence built; don't know who built it. I moved away from there in 1824; James was living on it then. Do not recollect whether the old man was along when the lines of my lot were surveyed. About the time I purchased there was about an acre cleared on this lot. I presume the old man told me this was James's. All the family spoke of it as his. The lot called, as adjoining me, as "James Wood's land," was this lot. It could be no other. Have seen James working on the lot after I purchased. The old man always told me James purchased the lot. Never heard him say how much it cost. I got mine surveyed at the same time James got his run. He told me his overrun 10 acres considerably; 13 or 14 acres. This was since the death of old Mr Woods. I lived on the lot four years; moved away in 1824.

John Woods, sworn.—I am a brother of plaintiff. Know the land in dispute. January or February 1815, my father told me he had sold this land to James. He told me also the price, 300 dollars. He said it was James's own offer. James took possession of the land in the last of March or first of April 1815. He lived there till spring of 1826; January to April 1826. I saw two payments made on account of this lot; one of 60 dollars, in 1826; the other of 40 or 45 dollars, the same year. The one was paid in money, the other in an order; do not recollect who it was on. It appears to me it was an order on Pentland, or James settled with Pentland for money my father owed him. William Fitzimmons got the 40 or 45 dollars from James for the use of my father. It appears to me James had a claim on Pentland, and gave an order on him, to my father, for 60 dollars. In fall of 1817, my father told me James had paid in full for the ground. I have seen my father point out the lines of James's lot. It included the ground Farmare is in possession of. Suppose there was from 12 to 16 acres in James's lot; it runs from Denny lot up to Reserve line. James built fence on the land; did not see it built; saw it was done after he had it. Part of the fence between him and Carson was built before Carson bought; no fence there when James went there, but a brush fence. Mrs Gray built the cabin in 1814. James fenced in from 4 to 6 acres, probably 6 acres; some of this same fence is still standing, some moved by Davis on lines he had run. After James moved off, he let his mother have it for pasture; she did not live on it; she let a widow woman go into it by name of Bennet; from her Mr Davis got pos-

[Woods v. Farmare.]

session; I was not present. James raised corn and potatoes on it; planted cherry trees and peach trees. Not a quarter of an acre cleared, or much more, when James got it.

Cross-examined.—My brother James will be fifty years old in February. I did not see money paid to Fitzimmons; the 60 dollars was on the land I am certain; the 40 dollars also; saw no money pass between them. James assumed to pay Fitzimmons; heard Fitzimmons say he had paid it. Saw no money paid on the 60 dollar order; I saw money in the last payment; James was present; the money was on the table; saw my father lift it; heard him repeat it there, and the day after, that that was the fulfilment of the payment on the land; this was late in the fall of 1817. I did not see receipt pass at any time; can not tell why a deed was not given. It may not have been in full. In 1825 James moved off the land to Alleghenytown, to a house of William Robinson, near where Irwin's brewery stands. Mrs Bennet went into possession in the spring of 1826. The cabin was built in 1814. I bought a piece too, by parol agreement, from my father. James followed boating in 1815, 1816, and 1817, and occasionally afterwards. His wife and children lived in the house. It was between November 1825 and March 1826, he moved to Robinson's house.

Joseph Woods, sworn.—I am brother of plaintiff; know the land; think James went into possession in 1815; my father died September 2, 1819; my sister had lived on it before James got it; she had built the house. The first knowledge I had of the lot being sold, was in summer of 1815, by Tobias Woods, a brother of my father. He had some grant of the lot, and had made some repairs to the house. During the summer I heard my uncle Tobias exclaim against my father for selling the land to James. My father told me he had sold it; he did not say in my presence for any particular sum; from that on I always heard it go in the name of James; do not know whether it was before or after James went into possession, that the bargain was made. Think it was in 1817; do not recollect the month or the day. I saw James pay my father about 30 dollars. He turned round and said to my mother and others present, that that was the last payment for the ground James lived on. Never saw any other money paid. One time I was clearing, my father showed me where James's line would run across his land; a part of two tiers of lots. Heard my father speak of James having paid a judgment in favour of Michael Brenner, on esquire Sample's docket, and another claim to William B. Foster. I knew James to be in the house from 1815 to fall of 1825, when I went to Cincinnati. It seems to me James Pagan was present when the 30 dollars was paid: he lived near, and often worked for my father. I came back from Cincinnati in June 1826. James lived in Alleghenytown then; he cleared 4 or 5 acres; built a small stable, planted some peach trees and some cherry trees; some fence; fenced in about 6 acres. In fall of 1820, Mr Hilands run a line for

[Woods v. Farmare.]

James between him and me. He had cleared some two or three rods over what Mr Hilands said would be his line; he built a fence on that line afterwards.   I was clearing for my mother then.   My uncle Tobias died in 1816.  It was before I went to Cincinnati. Mr Fetterman bought that property at the sheriff's sale.  It was on a very cold day; a good many present; Mr Fetterman, Mr Burke, Mr Ross, myself, Jeremiah Woods; John Woods was not there.  James was not here at the time of the sale.   I had a map of the reserve tract; I showed it to Mr Fetterman; I told him at the time, that lot No. 200 belonged to James Woods and William Carson; a part, if not all.   He asked me to show him what lot the house stood on; that is on lot 201; a house that John Woods, Jun. had built.   Mr Ross and myself made out this list for the sheriff to levy. I showed him such and such parts of lots had been broken and sold off.   Lot No. 200 was not included in what Mr Ross and myself gave in. When he took down No. 200, I then made a statement that a part, if not all of it, belonged to James and Carson.   This list was made out in the sheriff's office.   Mr Ross and I made out a list of lots to be levied on, as belonging to my father.   James Woods was in possession of this lot at the time of the sheriff's sale; his family living in the cabin.   When I returned in 1826, he was living in Alleghenytown.   James was living on the lot at the time my father told me he had sold the property to James.   It was in summer of 1815; he did not say when he had sold to him.   I came back from Cincinnati last of June 1826.   Hilands did not survey Carson's land in 1820, when he run the line for James and me. Do not know of any survey before my father's death.  John Woods went into possession of a part called his in 1820; he remained in possession two or three years.   Samuel Croll lived in his house after he left it, till Davis took possession.   I bought some lots at sheriff's sale of my father's property.

  . James Pagan, sworn.—I formerly lived near old John Woods.   I lived in Mifflin township.   Left the neighbourhood of Woods in 1826.   I was in the habit of working for Woods.   I shingled a house for old Mr Woods.   The old man engaged me to put on the roof, and went with me into the woods to show me a shingle tree. I found a tree standing near a fence.   He told me I could not cut that tree, it belonged to James.   I found another not far from that, which answered the purpose on his own land.   Some time after that James Woods came into the house.   His brother John and I were sitting in the room.   James says to his father, "father, I am going to pay you out for my lot."   He laid his pocket book down on the table; took out the money and counted it.   I think the amount was 30 dollars.   The old gentleman took it up in his fingers this way, and said "now you see, men, I am paid for my lot— and I will make James his deed as soon as possible."   James was living on this lot at the time I cut the shingle timber; it was in 1816.   I knew James to live there three years.   He had peach

trees and cherry trees growing—saw corn growing. Can not tell whether he was on the land in 1826, when I went away. I have no idea of when he left the place. I think it was in 1817 when the money was paid. It was after I had been up with James to Waterford. Took up provisions for Pentland, state army contractor. The tree I wanted to cut was a black oak within his line about eight feet.

Cross-examined.—At the time the money was paid, my brother John was present. He is dead. No other person present that I know of. The money paid was all paper. I would mind what took place if it was a hundred years. James Woods told me about five years ago, that I must recollect. I could tell him every thing as I do now. I did not ask time to reflect. He met me in Alleghenytown. Never conversed about it till James and I had this conversation. I thought about it many a time, because I thought there *would be* a lawsuit at any rate. Because the old man was involved; and James had never got his deed. Nothing said in 1817, about *the old man's being involved.* I heard it afterwards. Robert Taylor told me of it two years afterwards. Have never had any conversation with John, James, or Joseph Woods on the subject. The old woman (Mrs Woods) not present when the money was paid. John Woods was a cripple in the arm in 1817.

Samuel Bennet, sworn.—I was present in Alleghenytown in William Carson's shop; it must have been about 1826. James Woods was at the shop. Robert Davis came there. The conversation turned on this piece of property. Mr Davis took out what *I took to be a deed.* And said he was about buying or going to buy this piece of ground. I did not understand from whom. James Woods said the ground belonged to him. James Woods told him if he bought that ground he would buy a lawsuit with it. They parted on very bad terms. Robert Davis lived on Liberty street at the time.

Cross-examined.—He pulled out what appeared a deed. As near as I can recollect he said he was going to buy. It might be he said that was a deed; but not as near as I can remember. That was his language as near as I can recollect. As near as I can recollect when Davis went out of the shop, he had not bought nor would not buy. They appeared to be bad friends from what had passed. It was summer season. It was a warm day. When James Woods summoned me before, I was asked what I remembered. At the time Davis went out of the shop, James Woods asked me to recollect what had passed. Besides Woods and Carson, there was present James Kelso and John Vanderout.

William Carson, again.—When I understood my property was sold, I was uneasy about it. I took my deed along and showed it to Mr Ross. He told me they could not hold, if I warned persons not to purchase it, if I heard any body going to buy it. James Woods was along at the same time. He gave him the same direction. Mr Thompson, an acquaintance of mine, was about to pur-

[Woods v. Farmare.]

chase. I gave him notice and he did not buy. I met Robert Davis one day at the Allegheny bridge—told him the property was mine, he should not buy. After this a while Mr Davis came to the shop; he pulled out his deed and said he had bought part of the land: said he had bought it for the express purpose of keeping it in the Wood's family; that if they would pay him the money, he would charge them no interest. He said the piece supposed to be mine he had not purchased, nor would not. Said I had served my time with him, and he did not think it right to buy my land. Some time after that a man was cutting timber. James Woods was present at this conversation in the shop. Davis said to James he had bought the land. He showed the deed, and said he had bought it to keep it in the family. James seemed to agree pretty well about it. James warned him at that time not to buy his part. He said he had not bought his or mine. He gave no reason why he had not bought James's. Kroll was cutting timber on my part. Davis came and warned him not to buy. He said he had bought it and did not care who knew it. Kroll told me this. I met Davis, told him what Kroll had said. We had angry words. He said he had bought it, and did not care who knew it. Davis lived in town here at that time. His father's place adjoins this land. James was not living on the place at the time of the conversation in the shop. It might have been a year after the sheriff's sale, may be more, can not say; can not say who lived on it then. A woman lived there, did not know her. Heard her name was Bennet I think. Know young John Woods; had his arm in a sling eight or ten years. Bennet was present at this conversation in the shop.

Plaintiff now gave in evidence deed from John Woods, Sen., to John Woods, Jun., dated March 8th 1815; offered for the purpose of showing a declaration of John Woods in his lifetime, that the land in dispute was the land of James Woods, it having a recital of boundary, as in the deed to Carson, already read, to wit:—"Cornering and running a line with James Woods with James Wiley and myself, the said lot to contain 10 acres, and to be surveyed to contain 10 acres."

The will of John Woods, dated September 4, 1819, devised this lot to James Woods.

Deposition of Sarah Woods.—"She heard her husband John Woods, and her son James Woods, counting some money, and her husband told her that James had paid him for 10 acres of land joining William Carson on the east, and James Wiley on the reserve line, and John Woods, Jun., on the west, and Harmar Denny or James O'Hara's heirs on the south, and that the land now in dispute is a part of the same 10 acres," &c.

Deposition of Fanny Gray.—"That in 1813 I built on the property, having received permission from my father, John Woods, and in April 1815, I gave possession to James Woods, the plaintiff

in this suit, by my father's orders, he having told me James had bought it, and showed me the direction of the line. This conversation took place in 1817; I understood James had bought it and paid for it in 1816; but not from my father. It joined lands of Wiley, adjoins Denny, John Woods, Jun., and Wm Carson."

Cross examined.—" I built on that lot, in the fall of 1813, a cabin house. I lived there from that time till the spring of 1815. I never saw my brother, the above-named James Woods, pay any money for the place. I only learned it from my father's words. Never saw any agreement or contract between them relative to this property. Never saw a deed. Have heard the plaintiff and my father talking about it. When I gave up possession in 1815, my brother did not tell me that he had bought it. I received information in 1816 from my father that James had bought it. In 1817, my father showed me the lines—said James had given him 300 dollars for it. I paid no rent, and received nothing for my house. I never heard of my brother paying rent to my father for the property. My father never took any interest in, or gave any orders relative to the cultivation of the place after my brother took possession of it, that I know of. I do not recollect my father telling me that James had bought it more than once, the time above spoken of, which was in 1817; also heard my father say that James had bought the land and paid for it."

The plaintiff concluded by giving in evidence the tax lists, showing that the land in dispute had been assessed in the name of James Woods from 1817 until 1826 inclusive.

The defendants then gave in evidence the record of a judgment of James Arnold against John Woods, entered October 9th, 1809, for 147 dollars. *Fieri facias*, No. 96 of November term 1809. Returned stayed. Also *fieri facias* No. 122, of April term 1819. Returned stayed. Plures *fieri facias* No. 164 of August term 1824. Levied, *inter alia*, upon the land in dispute. *Venditioni exponas* No. 81 of January term 1825, which was returned; sold the land in dispute to W. W. Fetterman and Robert Burke, Esq., on the 24th December 1824. Also the record of another judgment of John Irwin against the executors of John Woods, deceased, entered November 12th 1823, upon which executions were issued and the same levy made and sale at the same time upon this judgment to W. W. Fetterman and Robert Burke. August 24th, 1826, deed of sheriff Leckey to W. W. Fetterman and Robert Burke. November 22d 1826, deed, W. W. Fetterman and Robert Burke to Robert Davis the defendant, in consideration of 430 dollars.

Deposition of W. W. Fetterman.—I was counsel of Cæsar Fisher against Woods; Burke was counsel of Myers. We agreed to bid up the property to make something from judgments over the first cases held by Mr Ross. The sale was made under the control of Mr Ross on both the suits. Mr Burke and I bid for the property; and we agreed to make joint stock of it. Joseph Woods

x.—s

[*Woods v. Farmare.*]

was principal bidder against us. Saw him consulting with Mr Ross frequently. I know Mr Ross was a friend of the family. Can not tell the order in which the property was struck off. The highest lot did not bring over 210 dollars; one 180 dollars; others 60 and 70 dollars, except this. Not more than 6 or 7 acres in this lot. Not a word said to myself or to Mr Burke in my hearing about any person having a claim, either directly or indirectly, to these lots. They were cried as the property of John Woods in the hands of his executors, and there was no other notice at the time of the sale. Joseph Woods and I had some conversation. Burke and I were anxious to know on which lot the mansion house was. Joseph told me there was a house on one of the lots. We run it up to 150 dollars, supposing it to be the mansion house. It turned out to be a cabin. I suspected from Joseph Woods' smile after the biddings were over, that we had been rather salted, so I have learned since that the mansion house does not stand on any of the lots sold. Mr Burke and I had searched the records to get a description of the property to levy on our writs, but could find none. We bid to raise the property so we might get something for our clients. We met and made an appropriation of the money to the claims. I do not think I knew of this claim when I sold to Davis.

I told him I thought the title good except possibly Carson's claim. Carson had a deed for 10 acres, which took 2 or 3 acres out of this lot which he holds. " The mansion house is from a quarter to a half a mile from this lot. Davis owned land near to this. We got possession when we bought. We went out and took it. We made Davis but one deed for what he had purchased of us. The tenant either attorned, or we put another in. We had no trouble in getting possession. Do not think Davis had any knowledge of Woods' claim. After we got possession, and I think after we sold, had some conversation with Joseph about John Woods' claim; that we would have trouble with it."

Testimony of James Ross, Esq.

I was present at the sheriff's sale of the property of John Woods. I was counsel for Mr Oliphant—assignee of the Arnold and Irwin judgments. Was well acquainted with John Woods; (gives history of time;) got behindhand. Judgments against him—one for Queens, a carpenter, who built his house—one to Arnold. Assigned to Oliphant, &c., &c.

They were all friends. But when Cæsar Fisher's judgment was pushed, they came in for the money. I hastened on the sale after his death. When the property was sold, I settled the distribution of the money.

During all this time I heard no difficulty about the title—no claim made by any of the children for the property which was agreed to be sold. Joseph Woods, one of the sons, was active in furnishing me with a list of the lots to be levied on. He bid at the sale, and bought lots at it. I advanced the money for Joseph to buy

[Woods v. Farmare.]

in some of the lots. John occasionally came, and brought part of the money that paid for the lots. I was not counsel for the executors—but holding the oldest judgments, they came to me to get me to help them along, and give them time. I have no recollection that any of them informed me of a claim on the lots, or requested me to put up a notice, which I would have done on request. The lots sold pretty well. Sons present seemed satisfied.

I think it probable I gave sheriff a levy of the property sold. Had a draft of the reserve tract.

The court below thus charged the jury:

*Grier*, president.—" The property in question was the property of John Woods, Sen., who died in 1819. Being considerably in debt, this, with other property claimed by him, was levied on, in the hands of his executors, sold to pay his debts, and purchased at sheriff's sale by W. W. Fetterman and Robert Burke, Esqrs.; who sold to defendant, Davis. The defendant has therefore shown a legal title to the premises.

" The plaintiff claims under a parol contract, which he alleges to have been made with his father in his lifetime, for this property, with payment of the purchase-money, and delivery of possession.

" Although one of the judgments under which the property was sold was antecedent to this alleged purchase of the plaintiff, yet as it had not been revived by *scire facias*, and the executions issued on it were not levied on the land till fourteen or fifteen years after the judgment was obtained, it had lost its lien as against the title of the plaintiff.

" The question, then, for us to decide, is, whether the plaintiff has given such evidence of a parol sale as a chancellor would judge sufficient in equity to take his claim out of the statute of frauds.

And secondly, whether the defendant is a purchaser with such notice of the equitable title of the plaintiff that a chancellor would decree him to convey the legal title to the plaintiff.

[Court here referred to the statute of frauds.]

" This statute, as you see, requires the transfer of any estate in lands beyond a lease for three years, to be reduced to writing, and signed by the parties.

" This is the statute law of the land, and every day's experience more fully demonstrates that it was founded in wisdom, and absolutely necessary to preserve the title to real property from the chance, the uncertainty, the frauds, and the prejudices, attending the admission of parol testimony.

" It is true that courts of equity have in many instances relaxed the rigid requirements of the statute. But it has always been done for the purpose of hindering the statute, made to prevent frauds, from becoming the instrument of fraud. As where one purchases a tract of land by parol, pays all his money, receives full possession, and holds and uses it as his own, and another, fully aware of these facts, gets a deed of the property from the original owner. Equity

[Woods v. Farmare.]

interferes in such a case, and prohibits the last purchaser from taking the benefit of his purchase, and compels him to convey the legal estate to the other, notwithstanding the statute: or, in common phrase, takes the case out of the statute, and prohibits the last purchaser from converting the statute made to prevent frauds into an instrument of fraud.

" Now it must be plain, that the party who claims the interference of the chancellor has the burden of proof thrown on him. He knows, or is presumed to have known, that the law requires, as evidence of the title to land, that the contract be made in writing. He has acted with great negligence and folly who has paid his money without taking the proper and legal evidence. When he therefore requests a court to interfere for him, and save him from the consequences of his own disregard of the law—when he asks the court to decree in his favour, in the face of the letter of the law, he should be held rigidly to full, complete, satisfactory, and indubitable proof. If a chancellor were to decree a specific execution of a parol contract, in doubtful parol proof, on strained and fanciful inferences, or vague surmises, he would annul the wholesome provisions of the statute in search of a visionary equity, and introduce into the community the very evils which the legislature intended by the statute to remedy.

" The plaintiff is therefore bound to prove to you, fully and satisfactorily,

1. " What the contract was—the precise terms of it—what land he bought—how much—so that the court cannot mistake as to the subject of the contract. There must be such evidence as to what were the boundaries, that from the clear testimony a deed could be drawn, fixing, to a common and reasonable certainty, the boundaries and quantity of the land sold.

2. " He should show clearly what was the consideration, and most clearly and conclusively that it was also paid.

3. " That possession has been delivered to him of the land purchased in pursuance of this contract.

" If he has done this fully and satisfactorily, and has shown also that the defendant had notice of his title, or such knowledge that it would be contrary to good faith for him to insist upon his legal title, then, and not till then, has he a right to call upon the court and jury to interfere for him against the plain requisitions of the statute, and protect him against his own disregard of its enactments.

" And before we proceed to a more particular examination of the testimony, to see whether the plaintiff has brought his case within these requirements, I would remark, that in cases of this kind, where the powers of the chancellor are in this state exercised through the medium of a court and jury, it is usual, and thought necessary and proper, for the court to go into a careful examination with the jury, to assist them in properly estimating its nature, weight, and relevancy—not for the purpose of dictating to them whom they

shall believe, and whom not, but to enable them to arrive at the same conclusions which a reflecting and experienced chancellor would draw from the testimony. It has too often happened, in our peculiar method of administering equity, that it has been done upon no known principles of either law or equity. But the courts having carelessly cast the responsibility upon the jury, have administered a sort of vague justice, without precedent and without principle, like Turkish cadis, legislating each case according to their own vague notions of right and wrong. By this means, the principles that govern real property become unsettled, and our titles uncertain and insecure.

[Here the court went into an examination of the evidence.]

" It has been argued here from some expressions of the chief justice in his opinion delivered in this case, that he had decided that a *presumption of law* arises from the possession of James that he had purchased the property. The court only decided that a man's possession was notice to put a purchaser upon inquiry as to his title. The judge never intended to assert, that because a son is in possession of a house on his father's farm, that, on the question before a chancellor of a specific execution of an alleged parol contract for it, the chancellor would infer the facts of a purchase as a legal inference from the fact of possession.

" A chancellor would require satisfactory proof of all the circumstances I have mentioned, before he would undertake to establish a parol sale. And will not from mere proof of a purchase infer a possession; nor from proof of a possession infer a purchase, or payment of the money. It is because all these facts being clearly proved, being such moral certainty of the truth of the alleged sale, and of the injustice that would arise from a revision of it, or a strict adherence to the statute—that he ventures to disregard the rigid requirements of the statute. He therefore requires clear and satisfactory proof on all these points, and will not take any of them upon doubtful inference, of one fact from another, where the connection is not a necessary one in the nature of things.

" Have you therefore clear and satisfactory proof: 1st, of a contract—its terms—what land was sold—what are the boundaries, and the price?

" If a chancellor were to order a specific execution on this evidence, can you say clearly and explicitly how much land, and how the lines are to run from any testimony before you? John says it was from 14 to 16 acres; Joseph mentions no quantity nor price: the mother says 10 acres, and so does the will; which would you decree?

" Have you any evidence that ever any lines were run, and a specific portion of land set off to James, in pursuance of the contract, so as to satisfy you where you must begin, and to what corners you must run. If the quantity were fenced, if it had been a sale of lot No. 200, or any lot or lots which have known bounda-

x.—s*

[Woods v. Farmare.]

ries that would get over the difficulty. The ejectment is brought for lot No. 200. The house James occupied is on this lot, but one witness says that James purchased lot No. 200. It contains seven acres and some perches. Joseph says the old man showed him the lines and so does Ragans. But in what direction did they run— from what corner to what other, and how long? The mother speaks of the adjoining owners to James, but does not in the brief and meagre testimony contained in her depositions, say whether these were the bounds given by the contract, or only her own description of the general locality. Besides, it could not well have been the boundaries fixed at the time of the alleged sale, as the sale was made to Carson and John after it took place. Besides, if you were to decree a transfer of all the lands between those adjoiners, do you know with any certainty what amount is contained therein, 10, 16, or 20 acres or more.

" 2. Supposing you to be satisfied with the testimony given by the plaintiff on these points, you have next to inquire whether the defendant is a purchaser without notice; for if he was, his equity is equal to the plaintiff's, and having the legal title it will prevail.

" On a former trial of this case, I instructed the jury that the possession of James at the sheriff's sale, under all the circumstances of the case, was not a sufficient constructive notice. In this, I have been convicted (but not convinced) of an error. You are therefore instructed, that the possession of James at the time of the sheriff's sale, was notice to the purchasers, Messrs. Fetterman and Burke.

" But had the defendant, Robert Davis, notice of James's claim when he purchased? James lived in Alleghenytown at that time, had left the lot, say the witnesses, to his mother for a pasture lot: that she had put an old woman on as tenant. Fetterman swears, that when he purchased he took possession, and the tenant attorned to him. If then the purchasers at the sheriff's sale had possession when they sold to Davis, he was not affected with constructive notice. Had he actual notice? (Refer to testimony of Bennet and Carson.)

" If the notice proved by them was given after Davis had paid his money and got his deed, it came too late.

You ought not to guess at knowledge or notice without proof; or from the circumstance that Davis's father lived in the neighbourhood of Woods."

The plaintiff in error assigns the following errors to the charge of the court:

1. The court charged that it was necessary in this case, that the plaintiff should satisfy the jury of the extent of the boundaries, and that unless he made out by clear testimony the quantity of land sold to him, his contract, being a parol contract, was void.

2. That the court charged in substance, that there was not sufficient evidence of notice, under whom defendant entered, of the title of the plaintiff before he, Davis, purchased.

[Woods v. Farmare.]

3. The court charged, that the notice to Fetterman, from whom Davis purchased was not notice to Davis.

4. The court charged the jury, that by the attornment of plaintiff's tenant, Fetterman had gained the possession, and that although the same tenant had possession when Davis purchased, Davis was not visited with notice.

5. The court erred in not charging the jury, that if they believe all the testimony offered by the plaintiff, the plaintiff had sufficiently proved the contract, delivery of possession under it, and the payment of the purchase-money.

6. The court erred in charging the jury in effect, that there was no evidence from which they would be authorized to infer that Robert Davis at the time he purchased, knew of the claim of Woods, the plaintiff.

*Shaler* and *Lowry*, for plaintiff in error, cited 7 *Watts* 386; 6 *Wend.* 228.

*M'Candless* and *Metcalf*, for defendant in error, cited 6 *Watts* 464; 2 *Serg. & Rawle* 352; 3 *Penn. Rep.* 332; 5 *Bin.* 132.

The opinion of the court was delivered by

Rogers, J.—We discover nothing in the charge of the court below, which in the slightest degree contravenes the well established principles of law. In that part of the charge in which it is said the plaintiff should satisfy the jury of the extent and boundaries of his claim, and that unless he made out, by clear testimony, the quantity of land sold to him, the contract was void, is supported by Robertson *v.* Robertson, 9 *Watts* 42, and other cases. The facts were left to the jury, with a clear and lucid statement of the law, but with a strong intimation of the court on the weight of the evidence; in this, as has been repeatedly ruled, there is no error. We agree, that in such cases, it is the duty of the court, carefully to examine the case, so as to assist the jury in estimating the nature, weight and relevancy of the testimony. We have failed to perceive that in this instance the court have transcended these legitimate limits.

Judgment affirmed.