## Haines *against* O'Conner.

10 w 313
187  192

When a transaction in relation to the purchase of land has been carried on *mala fide*, there is a resulting trust by operation of law; yet unless there be something in the transaction more than is implied from the mere violation of a parol agreement, equity will not decree the purchaser to be a trustee, but will put him to his action for damages for the breach of such parol contract.

A purchaser at a sheriff's sale who has paid the purchase-money, can only be held to be a trustee on the ground of fraud; when he is guilty of fraud he is a trustee for the creditor and for the debtor also, unless he be *particeps criminis*.

ERROR to the district court of *Allegheny* county.

Peter Haines against Nathaniel Patterson and Mary O'Conner. This was an action of ejectment for a lot of ground in the borough

x.—2 b*

of Birmingham. The original title was admitted to have been in the plaintiff Peter Haines.

The defendants gave in evidence a judgment of Thomas Alger against Peter Haines, entered in 1831, a *fieri facias* upon it, a levy of the lot in controversy, inquisition and condemnation, *venditioni exponas* to January term 1823, upon which it was sold to Dominick O'Conner for 312 dollars, who received the deed of the sheriff dated March 21, 1823; also the will of Dominick O'Conner dated February 16, 1831, devising the property to Mary O'Conner the defendant.

. The plaintiff then called several witnesses to establish the fact that the purchase at the sheriff's sale by O'Conner was for the plaintiff, and he was therefore a trustee:—

Edward Ensell sworn:—I was one of the original partners with Haines. Know the property well. This lot was assigned to Peter Haines in our deed of partition No. 7. Peter Haines put up a two story brick house on the lot, and kitchen, smoke house, &c. What it sold for at sheriff's sale did not pay for the brick in the house; would suppose it would have cost 2000 dollars to put up that house and finish it as it was in my opinion. I was present at the sheriff's sale; on that day Mr. O'Conner and I were standing before the cow house by the pump; when the sale was opened the sheriff's advertisement was read by Mr Hubly, and Mr Wendt bid 250 dollars for this house and lot; stood three or four feet from O'Conner and me; O'Conner said what are you bidding for; don't bid, says he; I am bidding in for Peter; says Wendt I am glad of that, for that is my intention; from that Mr Wendt left us; there were a great number of people around; bidding soon ceased; none but Wendt was apprised of the nature of O'Conner's bid; but after he went round they ceased bidding, and it was knocked down for 312 dollars. Any person within six, eight or ten feet might have heard the conversation between O'Conner and Wendt. I heard Wendt say, we need not bid against one another. After the sale was over, Mr and Mrs O'Conner walked home together to Birmingham. We had chat about the nature of this sale; says I, Mr O'Conner, you are believed to be Peter Haines' friend; says he, I am. On Sukes run bridge, says he, stop, I will tell you something particular; I am determined, says he, to be Peter Haines' friend in spite of all the manifestations of Sutton, Wendt & Co., to oppress him. Whenever Peter Haines pays me what I have to pay the sheriff it is his property, for I will not lay out a fi'penny-bit on it. Me and Mr O'Conner were very intimate; he told me. time after time he considered it Peter's property whenever he paid him what he had to pay the sheriff. The sale took place on Wednesday or Thursday; Mr O'Conner told me two or three days after on Tuesday evening, that Mr. Rhiter, a confectioner in the Diamond, had offered him 1000 dollars for his bargain, and says he, by the holy father I won't sell it to any body;

[Haines v. O'Conner.]

I bought it for Peter, and it is his whenever he does what I have said.

Cross-examined.—As an individual, was friendly to Peter Haines; that was my impression from his saying I was going to bed for Peter too; a hard matter to tell what such property would bring at public sale at this time. I candidly believe it would have brought 2000 dollars at that time; since the sale the property has been in the possession of different persons; Thomas Johnson, son-in-law of O'Conner, lived in it some time; should suppose 100 dollars was a very moderate rent from the nature of the buildings and every thing concerning it. Haines lived in the house at the time of the sale; towards fall he left it, moved to Wheeling; O'Conner then went into possession. A single house, at least 24 feet in front; two rooms clear, suppose 30 feet deep, the house was built in 1812; after we had drawn for the lots, but before the deed of partition was made; we owed for the lots in 1812 in winter; house begun in the spring; deed not executed for a considerable time after; when I valued the building I spoke of the cost at the time it was built; in 1812 or 1813, they built mostly by book of prices; sometimes they threw off 10 per cent. and from that to 20 per cent. for prompt payment. I could have got it for 15 per cent. below book of prices at that time. In 1823 property sold for a pretty fair price at private sale, but when under the hammer it went for whatever could be got; a great deal of property sacrificed about that time under the sheriff's hammer; mine was sold shortly after this, at a sacrifice; it sold for less than the timber cost to put the house up. I don't know that the sacrifice was greater in this case than in others about that time; we stood by the pump when the property was knocked down; O'Conner went up to the window; Hubly cried the property; stood on the pavement by the window; Stewart was inside; Haines left the house and went to Wheeling, and has continued to reside there ever since.

John Keller, sworn.—Knew O'Conner and Peter Haines; a few days after the sale, perhaps a week, O'Conner mentioned to me he was very sorry for Mr Haines that his property was sold; that he had purchased it for 312 dollars; that he did not purchase for himself, but for Mr Haines; that at any time he paid him his money he might have the property; he lamented Mr Haines' case, that they had taken the advantage of him; he told me the same story different times afterwards; perhaps five or six times in the course of this year. The money the property was sold for would not pay for the brick and lime in the house; average value of the house rent from that till now would be about 100 dollars a year.

Several other witnesses testified to the same facts.

The defendant then gave evidence as follows:—

James Patterson, sworn.—I knew O'Conner; intimate with him; know the house; the condition was bad; it wanted a great deal of repairs at the time it was sold; after the sale it was repaired at

[Haines v. O'Conner.]

O'Conner's expense; a new roof put on the house; new shingles at least, and various other repairs; this was after Haines left it some considerable time; do not recollect who was O'Conner's first tenant, from anything I understood; on the day of the sale I was on the ground; had no conversation with any of the parties; some person; cannot recollect the sum, about 200 dollars or thereabouts; then there was a short adjournment of the sale; it was then about dinner time; Mr. Wendt and several others and myself, went to get some refreshments; I thought I heard Hubly crying the sale; I said to Wendt come, and the sale is begun; he said I will not go yet; I said I would go; came on the ground; they were crying it at 300, or 310 dollars, or something that way; I was standing a yard or a yard and a half off; I heard him bid —— dollars; after some little time it was knocked down to Mr O'Conner; Mr Wendt came up very soon afterwards; says he to O'Conner, who did you buy in for? he said for himself, at which Mr Wendt seemed very angry, and some very unpleasant words passed between them; I think immediately afterwards, Wendt, O'Conner and myself went to a house called the "Hole in the Wall," in Diamond alley, to get a glass of grog, and nothing further said on the subject; on the same night I went to O'Conner's house in Birmingham; he kept tavern; Wendt, Charles Johnson and several others there, a conversation, not of a very pleasant kind, about this bidding by them; Wendt seemed irritated; he went out; in a quarter of an hour he returned; seemed in a better humour; a little quiet conversation took place concerning this sale, the details of which I can not give; it was this that O'Conner said, that if the purchase-money were paid to him, and the debt Haines owed him, he would give up the property to him and his family, but to no other person—I would not take upon me to say positively, but think it was to be paid in one or two years. I believe Wendt wanted to purchase it for himself; I never heard him say a word about his wanting to purchase it for Haines; Wendt fond of a glass of grog, and apt to speak ironically. After Haines left, O'Conner took possession; Charles Johnson lived some time on the property; after that Mrs Johnson; much property sold about that time in Birmingham. It is my candid opinion, this property sold better than much other property sold in that place at sheriff's sales, but it did not sell for any thing like its value; I know this from woful experience; property that cost me upwards of 10,000 dollars, sold for 1200 and some odd. Here is the list of the sheriff's sale of my property; one lot sold for 110 *dollars*, a lot 95 feet by 60, on which was erected two good frame buildings two story high, about 24 feet each in front, 16 feet deep, with a kitchen 16 by 12; houses well finished. The next was lot 178, same size, and two houses finished in same manner, that sold for the enormous sum of 50 dollars. The next lot No. 83, no buildings on it— that sold for 30 dollars. Lot No. 89, on which was a two story frame house, buildings, &c.—sitting room—90 feet deep, that sold

[Haines v. O'Conner.]

for 155 dollars. Lot 98, which had shops, the carpenter work of which alone cost me 800 dollars, sold for 60 dollars. Lot 103, a stable and wareroom, sold for 51 dollars. No. 104, on which was a good two story frame house, 24 feet front, two rooms deep, sold for 150 dollars. Lot 188 for 50 dollars; another at 43 dollars; one acre at 96 dollars, and one for 68 dollars. On two of these lots was a brick house, the whole of it was sold for 1224 dollars; this was in 1822. One of these acre lots would sell now for 4 or 5000 dollars. Business was bad in Birmingham in 1823; many houses vacant; I had four vacant houses; sometimes tenants in who never paid any rent. A great many occupied without paying any rent, just to get some person to take care of the house; at that time if 40 dollars could be got a year clear, for such a house he would do well; I think none of them that had houses at that time got that; some change for the better in 1828. Know Peter Haines very well; he has told me many a time, if he had it in his power he would redeem the property; O'Conner always claimed the property to hold as his own, not for any body else.

Cross-examined.—A large crowd at the sale; when Wendt and I went to take refreshments, O'Conner did not go along; when we came back, O'Conner said he bid it for himself; Wendt got angry; had harsh words; Wendt intended to buy it for himself; from the conversation, that was my impression, he intended to purchase it for himself to secure himself; I did not hear Wendt say to O'Conner that he had promised to buy it in for Haines. My property sold on a judgment of Jones; one other judgment against me; some of my property is back in my family; M'Donald got a handsome profit on it; this property worth 150 dollars per annum now. I was at the sale from the beginning to the end. I did not hear it mentioned by any body, that the property was to be bid in for Haines.

Defendant's counsel requested the court to charge the jury, that admitting all the testimony in the case to be true, the jury ought not to give a verdict for plaintiff.

The plaintiff's counsel requested the court to charge the jury, that if they believed the testimony of Edward Ensell, they should find for the plaintiff.

*Grier,* president.—" The plaintiff in this case was formerly seised of the property in dispute. In the year 1822, like many others of his neighbours, he became entirely insolvent, and soon after all his property, real and personal, was sold by the sheriff, still leaving a large proportion of his debts unpaid. At this sheriff's sale, Dominick O'Conner became the purchaser of the property in dispute, for a sum vastly below what it had cost the plaintiff. Much of the property in the same place (Birmingham) was sold by the sheriff about the same time, and a great portion at a sacrifice even greater than that at which plaintiff's was sold.

" It is in evidence, that O'Conner declared at the sale that he was

[Haines v. O'Conner.]

buying it for the plaintiff, and that after the sale he frequently stated, that if the plaintiff or his friends would pay him his money, interest and a judgment which he held against plaintiff, he would convey the land to the use of plaintiff and his family, but would not let a stranger have it. It is stated by one witness, who was a relative of plaintiff, that this offer was repeatedly made to him afterwards and refused; till finally in 1829, the witness again, for the first time, offering to treat with O'Conner on the subject, was told by him, that it was now too late. Three years after this O'Conner died, having devised the property to his wife, the co-defendant in this case.

"In 1837, upwards of fourteen years after the purchase by O'Conner, and the property having greatly risen in value, this ejectment has been brought and a recovery is urged, on the ground that O'Conner was a trustee for plaintiff, that the rents and profits of the land have by this time reimbursed him the money he paid, and his judgment, and therefore the plaintiff should have the property.

" It is said that this case is precisely similar to the case of Brown *v.* Dysinger, 1 *Rawle* 408, in which a recovery was had before the circuit court and confirmed in the supreme court.

" The construction or rather misconstruction which has been too often put upon that case, has made it a dangerous precedent, and one which has caused a great deal of vexatious litigation in the country.

" We all remember how much property was sacrificed at sheriff's sale through this state, some years ago. In almost every instance where the property was purchased by a neighbour, he has expressed a willingness and desire to favour the former owner and his family, and to let them have the property again on refunding the money. But in those times of difficulty, when money was so scarce, few, very few, found means or friends to assist in recovering their lost estates. In course of time, when the property has greatly risen in value, and money become more plenty, friends, or at least persons willing to join in a speculation, are found willing to advance their assistance to disinter these stale and forgotten promises, and treat them as valid trusts. And many suits have been brought on the supposition, that the case of Peebles *v.* Reading and Brown *v.* Dysinger, established the doctrine, ' that, if I proclaim that I hold my house for B, on terms of conveying to him when he shall reimburse me, this is not a contract for sale within the statute of frauds, but a trust which a court of chancery would execute.'

" But those cases do not teach this doctrine, and if they did, it has since been overruled. Kepler *v.* Kepler, 2 *Watts* 325.

" You are, therefore, instructed, that if O'Conner purchased this property with his own money, expressing an intention to let the plaintiff have it by reimbursing him his own money, if he bought it fairly at the sheriff's sale, as the highest and best bidder, and afterwards frequently declared his willingness to give it him on

[Haines v. O'Conner.]

these conditions, which were not accepted by the plaintiff or his friends; that the case does not present such an one as a chancellor would treat as a trust *ex malaficio*, but is within the statute of frauds. That the only ground on which O'Conner can be treated as a trustee, must be on account of some artifice or fraud practised by him at the sale to the injury of the plaintiff and his creditors. .

" An attempt to establish a title to land by parol proof, of conversations made many years ago, is one not to be favoured. Where a party relies upon a charge of fraud and artifice, he should make out a clear case.

" Have you any proof to satisfy you that any fraud or contrivance was used by O'Conner to get this property below its value? Is there any evidence that his intention was generally known at the sale? or that even Wendt would have bid a dollar more than was bid for the property? Do you believe that the numerous creditors of the plaintiff, whose claims were not covered by this sale, refused to bid in order that the property might be struck off low for the use of the plaintiff and his family? All the testimony bearing on the subject, is that of one witness, who says, that O'Conner said to Wendt, " do not bid, I am bidding in for Peter." Was this, if said at all, said for the purpose of an artifice, with an intent to get the property at under price, and then refuse to let the plaintiff have it? Did he get a bargain of the property by this contrivance?

" If he did so express himself to Wendt, did he not do all that an honest man and a neighbour could be expected to do for the plaintiff. Did he not refuse 1000 dollars for his bargain, immediately after the sale; and even after the plaintiff had left the premises and removed out of the state, did he not offer to his relative here to give up the property if his money was returned?

" Was not the offer treated with neglect and even contempt for years? Was O'Conner, because he had expressed a benevolent feeling for his neighbour, bound to lay out of his money for years and years? Had he not a right to say, as he did at length say, ' I have waited long enough, it is now too late?' (The court then referred to the opinion of Judge Duncan in Peebles *v.* Reading.)

" If fraud and artifice was not used by O'Conner to get a better pennyworth of this property, to the injury of the plaintiff and his creditors, he was not a trustee, and his offers (so often repeated) to let the plaintiff have this property for his money and debt, might have been withdrawn at any time, much more after the plaintiff had trifled with them for fourteen years, and in the meantime the property being demised to the defendant, has been accepted by her in lieu of her dower in the estate of her husband."

*Shaler*, for plaintiff in error, cited 1 *Rawle* 408; 1 *Dessaus.* 289. *Forward*, for defendant in error.

[Haines v. O'Conner.]

The opinion of the court was delivered by

Rogers, J.—If the case of Browne *v.* Dysinger, 1 *Rawle* 408, has been understood to have ruled, " that if I proclaim that I hold my house for B; on terms of conveying to him when he shall reimburse me what I have paid, it is a trust which will be enforced;" it arises from a misapprehension of what was intended to be decided. A contrary doctrine is taught in Kepler *v.* Kepler, 2 *Watts* 327, and in the recent case of Robertson *v.* Robertson, 9 *Watts* 42. In the latter case it is ruled, that although in all cases of fraud, and where the transaction in relation to the purchase of land has been carried on *mala fide*, there is a resulting trust by operation of law, yet unless there is something in the transaction more than is implied from the mere violation of a parol agreement, equity will not decree the purchaser to be a trustee. A purchaser at a sheriff's sale, who has paid the money, can only be held a trustee *ex malaficio*, on the ground of fraud; and where he is guilty of fraud, he is a trustee for the creditors, and for the debtor also, unless the debtor be *particeps criminis*. But without the ingredient of fraud, as in the case of private sales, he may avail himself of the protection of the statute of frauds. There is nothing in the charge which contravenes these principles. The law is well stated, and the case has been properly left to the jury, under all the facts, with a proper direction; there is nothing, therefore, of which the plaintiff in error can complain. We must be careful to avoid unsettling titles to real estate, upon parol proof of bargains made a long time since, particularly where the property has greatly increased in value, or where it has passed into other hands. If the court should yield to such claims, it is impossible to foresee where the mischief will end, from the ease with which such testimony can be procured, tempted as they will be by the chances of receiving large estates, on proof of such agreements. If a parol contract for the conveyance of land has been violated, the party has his remedy by action, when he will recover the damages he has *actually* sustained.

Judgment affirmed.