## Kellum *et al. versus* Smith.

An absolute conveyance, intended to secure an existing debt and also future advances, accompanied by a parol agreement to reconvey whenever the advances should be repaid, is but a mortgage, and leaves an equity of redemption in the grantor.

A promise to purchase real estate at a sheriff's sale, and to convey it to the defendant in the execution, whenever he should repay to the purchasers their advances to him, does not raise a resulting trust in favour of the defendant.

Barnet *v.* Dougherty, 8 *Casey* 371, affirmed.

Such agreement vests in the former owner no interest in the land, which can be taken in execution by a judgment-creditor, unless there were fraud in the purchase.

A purchaser from the sheriff's vendee, is not affected by notice of such parol agreement; he can only be affected by notice of fraud in obtaining the title.

ERROR to the Common Pleas of *Bradford county.*

This was an ejectment by Alanson B. Smith against Samuel Kellum, Charles Kellum, Hampton Updyke, S. S. Bradley, Peter McCracken, and O. A. Holden, for 160 acres of land in Durel township.

[Kellum *et al. v.* Smith.]

The land in controversy was originally settled, in 1794, by Benjamin Ackla, who by his will devised it to his five sons, Amos, John, Jonathan, Benjamin, and William. In 1848, Israel Smith was the legal owner of 30 acres of this tract, set off to Amos Ackla, and known as the "Amos Ackla claim;" and the equitable owner of another part of the "Benjamin Ackla farm," containing one acre, and known as the "mill lot." He was also the equitable owner of an adjoining tract of 600 acres, known as the "Sarah Morrison tract."

In the summer of 1848, Israel Smith caused the legal title to the mill lot and the Sarah Morrison tract to be conveyed to Bell & Company, under an arrangement that they should hold the property as security for his indebtedness to them, and also for future advances which they agreed to make, to enable him to improve the mill lot. At this time, Smith was largely indebted to Bell & Company, and other creditors, and was apparently insolvent.

On the 13th December 1848, Saunders & Crook obtained a judgment against Israel Smith, for $279.95, which was revived in 1855, without notice to terre tenants, and under it, the property in dispute was levied upon and sold by the sheriff to Alanson B. Smith, the plaintiff. He received a deed from the sheriff, on the 20th December 1855, under which he claimed title to the premises.

On the 6th May 1850, the whole of the Benjamin Ackla farm, including the mill lot, was sold by the sheriff, under an execution against Israel Smith, and purchased by Bell & Company. The sheriff's deed to them was executed on the 9th of the same month; and under this sale, the defendants deduced their title to the Amos Ackla claim and the mill lot. They showed title to the remainder of the Benjamin Ackla farm, under the other sons of Benjamin Ackla, deceased.

On the 24th November 1854, Edward Overton purchased from Bell & Company for $6000, the mill property, the Ackla farm, and another tract; the deed was executed on the 7th March 1855; on the 11th April, Overton was put in possession by an amicable ejectment; and on the 23d June, he paid $1000 of the purchase-money.

At this time, Israel Smith was in possession, under an agreement to run the mill for Bell & Company. And on the 19th May 1855, he applied to the Court of Common Pleas, by affidavit, for restitution of possession; claiming that Bell & Company only held the title to secure the advances made to him; that he had been in possession and expended large sums in improving the property; and that Overton had been placed in possession during his temporary absence. In September 1855, the rule obtained by him was discharged.

[Kellum *et al. v.* Smith.]

On the 24th May 1855, Edward Overton, by articles, sold an undivided moiety of his purchase to Samuel Kellum, for $4000.

On the trial, the plaintiff, in order to rebut the proof of title, given by the defendants, offered to prove by Israel Smith, and others, "that the said Israel Smith, some time in the year 1848, purchased the mill property containing about one acre, and a part of the land in dispute, of George Tome, who held the legal title to the same in trust for the West Branch Bank at Willlamsport; and in the latter part of October 1847, paid one thousand dollars in full for the same. That being largely indebted in the city of Baltimore and elsewhere, among whom was his indebtedness to Saunders & Crook, who afterwards obtained judgment against the said Israel Smith, No. 38, February Term 1849, revived the same, and sold the property in dispute at sheriff's sale on said judgment to the plaintiff. That said Israel Smith being desirous of procuring means to rebuild the saw-mill, and make other improvements on said mill property, it was agreed between him, the said I. Smith, and the said Bell, Hollenback & Hand, that they should let him, the said Smith, have store goods, and make to him advances to help him, the said Smith, as he desired; and the said Smith should execute to them, the said Bell, Hollenback & Hand, or cause to be executed to them, a conveyance of the title of the mill property aforesaid, and give them a judgment-note of one thousand dollars, to be entered up so as to keep the said Bell, Hollenback & Hand secure, and prevent the creditors of the said Israel Smith from taking either his personal or real estate from him. That after the said Israel should get through and adjust his difficulties with his creditors, and should pay them, the said Bell, Hollenback & Hand, the amount of his indebtedness to them, they would convey to him the legal title to the mill property aforesaid. That in pursuance of said agreement, the said Israel Smith caused the said title to the mill property aforesaid to be transferred, by the said Tome, to the said Bell, Hollenback & Hand, and gave them a judgment-note of one thousand dollars to gain advances and secure them against his creditors, which was entered of record No. 158, December Term 1847. That subsequently, when the entire property was advertised for sale by virtue of a *vend. expo.*, issued by E. Overton, Esq., on No. 311, September Term 1849, the said Israel Smith went to the said Bell, Hollenback & Hand to see them upon the subject of the property being sold, and it was agreed between them, that the said Smith should suffer the property, advertised for sale as aforesaid, to be sold by the sheriff, and that they, the said Bell, Hollenback & Hand, would purchase the same, and take the title and hold the same for the said I. Smith, upon the terms of the first arrangement, until the said Smith should pay them off his indebtedness, and till he could safely hold the title as aforesaid. And had it not been for

[Kellum *et al. v.* Smith.]

the arrangement aforesaid the said Smith would have paid off said judgment, and the sale aforesaid would not have taken place. That he brought a letter from the said Bell, Hollenback & Hand to Mr. Elwell, who was acting as their attorney, to bid the property in for them. That said Smith, in order to have the property sold for the least possible amount, used means and prevented others from bidding on said property at said sheriff's sale. That the said Bell, Hollenback & Hand gave notice, by their attorney, that they held a part of the property, to wit, the mill property; and that the moneys arising from said sale were applied (over and above costs of sale which, by the arrangement aforesaid, the said Smith was to pay), on judgment No. 158, December Term 1847, given to secure future advances as aforesaid. And that from the first arrangement aforesaid, the said Smith has had the entire and exclusive possession of the property aforesaid, exercising all the acts of ownership that the said property is capable of. That the property was assessed as the property of the said I. Smith, and the taxes paid by him. That the said Smith has put up a double saw-mill, a grist-mill, and other buildings, and made improvements on the property aforesaid to the amount of seven thousand dollars, and paid said Bell, Hollenback & Hand, on advances made as aforesaid, about $4390. All of which the said E. Overton had legal notice, before his purchase of Bell, Hollenback & Hand."

To this offer the defendants objected, but the court admitted the evidence and sealed a bill of exceptions.

The plaintiff further offered to prove by Israel Smith, "that if the arrangement had not been made with Bell & Co. to purchase the property, or if they had refused to make it, he would have made the arrangement with some other person, or would have procured the means to pay the debt; that he had the means to have paid the debt, and could have made an arrangement to have had the property bid off for him." The court admitted the evidence, and the defendants excepted.

The defendants' counsel presented certain points in writing, upon which they prayed the court to instruct the jury, the 4th and 7th of which were as follows :—

4. That the alleged agreement between Israel Smith and William H. Bell, George W. Hollenback, and Jacob Hand, that they should, at the sheriff's sale, on the execution of William Gibson's use *v.* Israel Smith, bid off the property, and hold it to secure the indebtedness of Israel Smith to them, was void by the statutes of frauds and perjuries; and they, as the purchasers at that sale, had a right to sell the property to whomsoever they pleased, and the plaintiff claiming by virtue of a lien and sheriff's sale, since they thus acquired the title, cannot recover.

7. That if Israel Smith caused the legal title to be conveyed to Bell & Co., and then gave notice to Mr. Overton that he retained

[Kellum *et al. v.* Smith.]

the possession as their agent, and that the property was theirs, his possession was not constructive notice of any equity remaining in him; and he is, by such acts, estopped from setting up any title against Mr. Overton, the grantee of Bell & Co., and in the absence of *actual* notice of fraud brought home to Mr. Overton, before his purchase of Bell & Co., he and those claiming under him are entitled to hold the property, not only as against Israel Smith, but also against a purchase, at sheriff's sale, of Israel Smith's interest under a judgment attaching as a lien after the sale to Mr. Overton.

In answer to these points, the court below (WHITE, P. J.) instructed the jury as follows:—"If the jury believe the evidence of Israel Smith, the agreement of Bell & Co. to purchase for him and to hold under the arrangement stated, created a resulting trust, even though there had been no design to delay, hinder, or defraud other creditors. If the jury should find that the arrangement between Bell & Co. and Smith was intended to hinder, delay, or defraud creditors, then Edward Overton, the vendee of Bell & Co., stands in no better position than Bell & Co., and cannot be regarded as a *bonâ fide* purchaser without notice. First, because the possession of Smith was constructive notice of his interest, so far as the rights of creditors are involved. And secondly, because, on the 19th of May 1855, before any portion of the purchase-money was paid by him to Bell & Co., he had actual notice of Smith's interest, or such notice as ought to have put him on inquiry; for on that day, Smith filed an affidavit in the case of Edward Overton *v.* Bell, Hollenback & Hand, in the Common Pleas of Bradford county, setting out his interest in the premises, as the foundation of a rule to show cause why restitution should not be awarded."

To this charge the defendants excepted; and a verdict and judgment having been rendered for the plaintiff, for the " mill lot," and the " Amos Ackla claim," and in favour of the defendants, for the residue of the land, they sued out this writ, and here assigned for error, *inter alia :* 1. The admission of the testimony of Israel Smith. 2. The answers of the court below to their 4th and 7th points.

*Adams, Elwell,* and *Mercur,* for the plaintiffs in error.

*Watkins,* for the defendant in error.

The opinion of the court was delivered by
STRONG, J.—The case presented is this. In 1848, Israel Smith was the legal owner of the " Amos Ackla claim" (part of the Benjamin Ackla farm), and the equitable owner of the " mill lot," and of another tract of land called the " Sarah Morrison tract."

[Kellum *et al. v.* Smith.]

In the summer of that year, he caused the mill lot and the Morrison tract to be conveyed to Bell & Co., under an arrangement that they should hold the property as security for his indebtedness to them, and also for future advances which they agreed to make, to enable him to improve the mill lot.   At the time of these conveyances, Smith was considerably indebted to Bell & Co., and largely to other creditors residing in Baltimore and elsewhere—indebted, perhaps, in an amount greater than the value of the property which he then held.   Bell & Co. had knowledge of the indebtedness when they entered into this arrangement; and it may fairly be assumed, that this knowledge was the moving cause of the conveyances.   However that may be, the purpose was security to the grantees.   They took the lands as security for what they had already advanced, and for what they were still to advance, to enable Smith, the equitable owner, to make improvements upon the mill property.   They agreed to reconvey whenever their advances should be repaid.   This arrangement made Bell & Co., at most, but mortgagees of the property, and left an equity of redemption remaining in Smith.   After the deeds were made, Bell & Co. continued to make advances, and Smith remained in possession of the property, making large improvements upon it, paying the taxes, and treating it ostensibly as his own.

On the 13th of December 1848, Saunders and Crook obtained a judgment against Smith, which was a lien upon his equity of redemption.   This judgment was revived on the 29th of June 1855, against the debtor, but not against terre tenants. · By virtue of executions founded upon it, the property in controversy was levied upon, condemned, and sold to Alanson B. Smith, the plaintiff in this ejectment.   He received the sheriff's deed on the 20th of December 1855.   Previous to this sale, however, the whole Benjamin Ackla farm, including the "mill lot," had been levied upon as the property of Israel Smith, under an execution issued at the suit of John Ackla and others.   The levy was made under a *fi. fa.* issued to September Term 1849; the property was condemned, and on the 6th of May 1850, was sold to Bell & Co. The sheriff's deed to them was acknowledged on the 9th of the same month.   Unless this sale was fraudulent, or unless, in some way, it raised a trust for the debtor, it, of course, destroyed the equity of redemption, and divested all the interest of Israel Smith—leaving nothing to pass under the subsequent sheriff's sale to Alanson B. Smith.   The contest in this case is between the claimants under these two sales.   It may be added, that both were effected under judgments for debts existing when the original arrangement was made between Israel Smith and Bell & Co.

The case does not require us to consider, whether a mortgage to secure an existing debt, and future advances for the purpose of improving the mortgaged property, can be regarded as fraudulent

[Kellum *et al. v.* Smith.]

against other creditors, even though the mortgagee had knowledge of the existence of other creditors, and intended to obtain priority over them, when he took the mortgage. It is possible, that on another trial, that question may be distinctly presented. The material question now is, whether, after the sheriff's sale to Bell & Co., in May 1850, there was any trust in them for Israel Smith, the debtor. As already seen, that sale was made under an execution to which they were strangers. According to the testimony offered by the plaintiff in the court below, when the property was advertised to be sold, Israel Smith called upon them, and " agreed with them to bid off the property for him, and to hold it on the same terms as they held the rest of his property." Those terms were, that they should convey to him when they were repaid their advances. In reference to this part of the case, the defendants in the court below prayed the court to instruct the jury, " that the alleged agreement between Wm. H. Bell, George W. Hollenback, and Jacob Hand (Bell & Co.), that they should, at the sheriff's sale, on the execution to William Gibson's use (John Ackla and others) *v.* Israel Smith, bid off the property, and hold it to secure the indebtedness of Israel Smith to them, was void by the statute of frauds and perjuries—and they as the purchasers at that sale had a right to sell the property to whomsoever they pleased—and the plaintiffs claiming by virtue of a lien and sheriff's sale, since they thus acquired the title, cannot recover." The learned judge refused to affirm this proposition, and charged the jury that " if they believed the evidence of Israel Smith, the agreement of Bell & Co. to purchase for him, and to hold under the arrangement stated, created a resulting trust, even though there had been no design to hinder, delay, and defraud creditors." To this we cannot assent. A resulting trust cannot be created in such a way. Such a trust can arise only from the payment of the purchase-money, or from fraud in the purchase; fraud perpetrated by the grantee. Here the purchase-money of the sheriff's sale was paid by Bell & Co., and consequently the beneficial interest, as well as the legal estate, went to them. Had there been fraud in that purchase, they might have been held trustees *ex maleficio*. But the fraud which will convert the purchaser at a sheriff's sale into a trustee, *ex maleficio*, of the debtor, must have been fraud at the time of the sale. Subsequent covin will not answer, any more than subsequent payment of the purchase-money will convert an absolute purchase into a naked trust. When the purchaser at a sheriff's sale promises to hold for the debtor, and afterwards refuses to comply with his engagement, the fraud, if any, is not at the sale, not in the promise, but in its subsequent breach. That is too late. It is abundantly settled, that equity will not decree such a purchaser to be a trustee, unless there is something more in the transaction than the mere violation of a parol agreement. This was

[Kellum *et al. v.* Smith.]

asserted in Robertson *v.* Robertson, 9 *Watts* 32; in Haines *v.* O'Conner, 10 *Watts* 313; in Fox *v.* Heffner, 1 *W. & S.* 372; in Jackman *v.* Ringland, 4 *W. & S.* 149, and in Barnet *v.* Dougherty, 8 *Casey* 371. What more was there in this case than the violation of a parol agreement to hold the property for the benefit of the debtor? The purchasers practised no artifice. They did not proclaim at the sale that they were buying for Smith (as was done in the case of Brown *v.* Dysinger, 1 *Rawle* 408), and thus obtain the property at a reduced price. They were not even present. They caused nothing to be done there, except notice to be given of the title which they then held. Of this, Smith had no reason to complain. Whatever representations were made at the sale, were made by him alone, and at his own instance. The case of Brown *v.* Dysinger has been greatly misunderstood. What it was not intended to rule, was clearly stated by Judge ROGERS, in Haines *v.* O'Conner. Nor is the ruling in Morey *v.* Herrick, 6 *Harris* 123, necessarily in conflict with the doctrine of Jackman *v.* Ringland and its kindred cases. There the trust was created by a participation in the purchase, and by payment of part of the purchase-money. The case did not call for the observations of the judge who delivered the opinion of the court, respecting the bad faith or the fraud which raises a legal implication of a trust. It may in all cases be assumed, that when a promise is made to buy or to hold for another, confidence is invited, and more or less reposed. So it is, in every parol contract for the purchase of lands; but the statute of frauds would be worse than waste paper, if a breach of the promise created a trust in the promissor, which the contract itself was insufficient to raise. It may be that if, at the instance of the promissor, the promissee is induced to incur some expense, or perform some act which he otherwise would not have done, the former shall be estopped from denying the trust. But however this may be, mere quiescence, or omission to take other steps to obtain the property, though induced by faith in the promise, is not available for such a purpose. We think, therefore, that the court erred in their answer to the defendant's fourth point, as well as in permitting Israel Smith to testify, that if he had not made the arrangement with Bell & Co. he would have made it with some other person, or would have procured the means to pay the debt—that he had the means to pay it, and could have made an arrangement to have the property bid off for him. As the case was put to the jury, it is impossible for us to say, that their verdict was not founded upon the assumption of a resulting trust in favour of the debtor, growing out of the alleged arrangement prior to the sheriff's sale to Bell & Co.

We come now to the question of notice. Overton purchased from Bell & Co. after they had bought at sheriff's sale, and gave his bond for the purchase-money. Upon this bond, he paid $1000

on the 23d of June 1855. Had he notice before this payment of any right in Saunders & Crook, or any creditor of Smith, to sell the property as Smith's? It is obvious that this inquiry is material, only upon the supposition, that the original conveyances to Bell & Co., and also the subsequent sheriff's sale to them, were fraudulent as to creditors, or that the latter left a resulting trust in Smith, an equitable title, which could be seized and sold. At the time of Overton's purchase, Smith was in possession of the " mill lot," under a contract with Bell & Co. that he should run the saw-mill for them. The court instructed the jury, that " if they should find the arrangement between Bell & Co. and Smith was intended to hinder, delay, and defraud creditors, then Edward Overton, the vendee of Bell & Co., stands in no better position than Bell & Co., and cannot be regarded as a *bonâ fide* purchaser without notice; first, because the possession of Smith was constructive notice of his interest, so far as the rights of creditors are involved; and second, because on the 19th of May 1855, before any portion of the purchase-money had been paid by him to Bell & Co., he had actual notice of Smith's interest, or such notice as ought to have put him on inquiry, for, on that day, Smith filed an affidavit in the case of Edward Overton *v.* William H. Bell, George W. Hollenback, and Jacob Hand, in the Common Pleas of Bradford county, setting out his interest in the premises, as the foundation of a rule to show cause why restitution should not be awarded."

This, perhaps, was a correct answer to the point which the defendants below propounded, and therefore cannot properly be complained of as erroneous. But as the case goes back for another trial, it is proper to observe, that the inquiry for the jury was not whether Overton had notice of Smith's interest. If there was no resulting trust, the question was one of fraud upon creditors. Smith's interest was of no consequence to any purchaser, for that was divested by the sheriff's sale. It cannot be pretended, that he could have recovered in ejectment even against Bell & Co. But if the transaction was fraudulent, the rights of the creditors were superior to those of Smith. They claim not through the conveyances, but paramount to them; in spite of them. The notice, therefore, that could affect Overton, must have been notice of the rights of the creditors to resort to the land as Smith's, notwithstanding his arrangement with Bell & Co., and the sheriff's sale to them.

We will not enter now upon the inquiry, how far the possession of land is constructive notice to a purchaser of any other title or rights than those of the person in possession. That is a difficult subject, and will require careful investigation when it shall be presented. It is not now necessarily involved in this case. If it be conceded, that Smith's possession, after his arrangement with Bell & Co. in 1848, was constructive notice of ·whatever title remained

[*Kellum et al. v. Smith.*]

in him, it by no means follows that his possession after the sheriff's sale was notice of any title remaining in him then; much less of any rights in his creditors. Possession by a debtor, even of personalty, after a sheriff's sale, is no badge of fraud, though possession of personal property is the chief evidence of title. Why then should the possession of land sold at a judicial sale raise a presumption that the sale, though good against the debtor, was void against others? Admit that the purchaser from Bell & Co. was bound to inquire—admit that the continued possession of Smith made inquiry his duty—yet what would he have learned upon inquiry? At most, only that, under a former arrangement between Bell & Co. and Smith, a mortgage fraudulent as to creditors had been given—that notwithstanding the mortgage, a creditor intended to be defrauded had sold at sheriff's sale Smith's interest in the land, and that Bell & Co. had bought it at that sale, having promised by parol to convey it to Smith when he should pay the purchase-money and discharge his other indebtedness to them. Surely Smith's possession was notice to Overton of nothing more than the truth; of nothing more than he could have learned by inquiry. Had he known all this, why would he not have been a *bonâ fide* purchaser? And, though he might not have stood in any better position than that in which Bell & Co. stood after the sheriff's sale, *as regards Smith*, what knowledge could he have had of creditors' rights? We say nothing now of Smith's disclaimers of ownership while he was in possession; nothing of his written agreement to hold the property as the agent of Bell & Co., all of which was communicated to the purchaser before he bought. This was properly presented to the jury by the learned judge, and this might not affect creditors, if the prior conveyances were fraudulent. The case of Hood *v.* Fahnestock, 1 *Barr* 470, was decided upon its peculiar circumstances. I do not understand it as laying down the broad proposition that possession by a grantor after a conveyance, is notice that the conveyance which he has made is fraudulent as against creditors. If it be so, then such a possession, instead of being an assertion of right in the occupant, is notice of rights hostile to him. Then no man can safely buy land which is not in the actual possession of the vendor. But we repeat, it is not our intention to consider this question. That which the court denominated the actual notice given by Smith's affidavit, extended no further than to give knowledge of the original mortgage or pledge. It was no more operative than was Smith's possession. It did not pretend, that he had any title after the sheriff's sale.

In the aspect which this case presents to us, however, the question of notice does not seem to be of much importance. If, as we have seen, there was no resulting trust arising from the sale to Bell & Co., then, even on the supposition that the original arrange-

[Kellum *et al. v.* Smith.]

ment was a fraudulent one, we do not perceive how any title remained in Smith, or how any rights to resort to the land survived to the creditors, after they had once sold it. If this be not so, it must be because Bell & Co., the original fraudulent pledgees, became the purchasers at the sheriff's sale. That sale ,however, was not in pursuance of their previous arrangement with Smith. It was no link in the chain of the alleged fraud. It was effected at the suit of an outside creditor, one of the persons alleged to have been intended to be defrauded. Under such a proceeding, why could not Bell & Co. purchase? Grant that, if it had been their own judgment, taken as a part of the machinery of the fraud, they would have continued trustees after the sale, what then? It was a sale over which they had no control. If they held a vicious security before, might they not strengthen it by buying a good title? Might they not even abandon all former claims, and purchase as if nothing had ever taken place between them and Smith? The case seems to have been put to the jury, on the ground that it was an inevitable conclusion, that the sheriff's sale was fraudulent, if the original arrangement was. In this we think there was error. They were transactions entirely disconnected. The sheriff's sale divested all Smith's interest, and all the rights of his creditors to pursue the land, unless it was fraudulent in itself.

It is unnecessary to notice the other errors assigned in detail. They are sufficiently noticed in what we have already said. As the case goes back for another trial upon the principles here laid down, some of them are unimportant, and the others are embraced in those we have considered.

We may add, that we do not perceive how the plaintiffs in error were injured by the instructions given to the jury, to which exception is taken in the third assignment.

Judgment reversed, and a *venire de novo* awarded.