# Carhart's Appeal.

1. A court of equity will execute a trust where there is a valuable consideration ; but if it be voluntary the legal estate must be put out of the settlor ; the question as to its validity being whether it was at first perfectly created.

2. In general, a court of equity will not execute unexecuted voluntary contracts *inter vivos*, but will leave the parties to their remedies at law.

3. The simple avowal by a purchaser at sheriff's sale, whether made at the time of the purchase or afterward, that the purchase was for another, will not support the allegation of a trust.

4. Power signed a paper stating that if he purchased lands about to be sold by the sheriff, he would hold them on specified trusts for creditors of the defendant in the execution ; after his purchase of the land, *Held*, under the circumstances of the case, not to create a trust in Power.

February 25th 1875.  Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON and WOODWARD, JJ.

Appeal from Nisi Prius.  In Equity : Of January Term 1870, No 35.

The bill in this case was filed, January 20th 1870, by Lyman B. Carhart, trustee, and Daniel D. Badger, against George F. Power and William H. Marston.

The plaintiffs brought the bill as judgment-creditors of Caleb Barstow, both on behalf of themselves and all the other creditors of Barstow, who might come in, &c.

The bill set out :

1. On the 29th of July 1864, Caleb Barstow and John Eger-

[Carhart's Appeal.]

ton became the owners, in equal moieties, of a tract of land in West Philadelphia, subject to two yearly ground-rents, one for $2772.71, payable to the estate of John Hare Powell, deceased, the other for $1380, payable to the estate of Robert Hare, deceased.

2. Barstow, when he and Egerton became owners of the property, and subsequently, was indebted to the plaintiffs and other persons; and Power, one of defendants, claimed to be a creditor of Barstow.

3. In 1866, Barstow, by reason of financial embarrassments, &c., and in order to evade the demands of his creditors, arranged with Power, that he should become the purchaser of Barstow's interest in the West Philadelphia lands at a sheriff's sale, provided Power would execute a declaration of trust for the benefit of Barstow and his creditors; in pursuance of this arrangement, Power obtained a judgment against him in the District Court of Philadelphia, for $18,166.55, under which, in September 1856, the premises were sold by the sheriff to Power for $1000; the interest sold being valued at $100,000, subject to the ground-rents.

4. "Previously to the sale, according to its date, but subsequently thereto, and after Power had obtained title to the premises," he executed a declaration of trust, dated September 17th 1866, which was recorded in Philadelphia, February 2d 1867 (a copy, B, being appended to the bill), and which recited that Power was about to become the purchaser of Barstow's interest in the West Philadelphia land, and declared that the land, if purchased by him, should be held in trust: (1.) To pay Power's judgment of $18,166.55. (2.) To pay a judgment against Caleb Barstow in favor of Barstow & Pope for $75,000. (3.) If a balance remained to pay the creditors of Caleb Barstow. (4.) As soon as Egerton's interest could be controlled, Power was to convey Barstow's interest to whomsover should be selected as trustee, so that the entire property might be consolidated in one person, and the sale facilitated, yet not so as to prejudice any claims against the interest.

In pursuance of the arrangement, on the 22d of September 1866, three days after executing the declaration of trust, the sheriff made a deed to Power of all Barstow's interest in the land without reciting the trust.

5. The judgments mentioned in the declaration of trust were fictitious, used to defraud and deceive the plaintiffs, and general creditors of Barstow.

6. Egerton's interest having become vested in Drayton, an ex parte partition of the land was had in the District Court of Philadelphia, by Power, against Drayton, and part of the property (designated as C.) was assigned to Power in severalty.

7. Power, intending to defraud Barstow's creditors, wilfully allowed the two ground-rents to fall in arrear, without notifying

the creditors or applying to them for funds to pay the arrears, with the design to vest the title to the premises absolutely in himself; suits were brought and judgment obtained for the rents; the premises were taken in execution at the instance of Power, and at his request; also, Morrill became the purchaser of both the Barstow and Drayton properties, at the nominal sum of $1500, subject to the principal of the two ground-rents, and deeds were made by the sheriff to Morrill, October 10th 1868.

8. On the 14th of October, Morrill conveyed to Power the part of the lands which had been allotted to Power under the proceedings in partition. Morrill's deeds recited the proceedings in partition, but not the declaration of trust.

9. The consideration for both lots sold by the sheriff was paid by Power, who was reimbursed for one-half of the consideration by the Union Car Company, who were owners of part of the premises.

10. In pursuance of his fraudulent purpose, Power, on the 16th of October 1868, conveyed part of the premises to W. H. Marston, who purchased at the request of Power, with notice of the trust.

11. Power refused to acknowledge himself trustee or to render an account.

The prayers were:—

1. For discovery.

2. For an account by Power of all the liabilities of Barstow; for the moneys disbursed by him, Power, on account of the trust estate; and that he be decreed to hold Lot C. in trust for the purposes aforesaid.

3. For a decree that, the sale and deed by the sheriff to Morrill, the deed from Morrill to Power, and the deed from Power to Marston, were null and void.

4. That defendants might be restrained from selling, mortgaging or interfering about the premises so held in trust.

5. For the removal of Power from the trust.

6. For general relief.

The declaration of trust (B.) was as follows:

"Whereas, I, George F. Power, of Brooklyn, in the state of New York, am about to purchase the undivided one-half interest of Caleb Barstow in certain lands situate in West Philadelphia, in the state of Pennsylvania, for sale by the sheriff; said lands being more particularly described by writ issued out of the District Court of Philadelphia, September Term 1866, No. 218: Now, know all men by these presents, that the said lands, if purchased by me at the sale thereof, to be held this day, shall be held in trust for the following named purposes, to wit:—

"1st. The proceeds of sale thereof shall be applied to the payment of the judgment in my favor, amounting to $18,665.55, with interest and costs.

"2d. Any balance of proceeds derived from sale thereof, shall be applied to the payment of a certain judgment against Caleb Barstow, in favor of Barstow & Pope, for about $75,000, together with the interest and costs thereon.

"3d. Should any balance remain after the payment of the above amounts, then to apply the same to the payment of the creditors of said Caleb Barstow.

"4th. It being understood and agreed, so soon as the undivided one-half interest of E. F. Drayton in said lands can be controlled, I agree to convey to whoever shall be selected as trustee thereof, the Barstow undivided one-half interest, to the end that the entire property may be consolidated in the hands of one person, and the sales thereof facilitated thereby; such conveyance or transfer, however, not to prejudice any claim against said interest.

G. F. POWER."

Philadelphia, September 17th 1866.
    Witnesses, at signing:
        THOS. A. GUMMEY,
        H. R. WARRINER."

"Be it remembered, that on the 2d day of February, A. D. 1867, before me, the subscriber, an alderman of the city of Philadelphia, personally came Thomas A. Gummey, one of the subscribing witnesses to the execution of the within deed-poll or declaration of trust, and being duly sworn according to law, doth say that he did see the within named George F. Power sign the same, and as his act and deed deliver the above-named instrument for the purposes therein mentioned; and that he did also see H. R. Warriner subscribe his name thereto as the other witness of such delivery, and that the name of this deponent thereunto set and subscribed as a witness, is of this deponent's handwriting," &c.

Recorded, February 2d 1867.

The defendants' answer was filed May 16th 1870.

3. They denied any arrangement between Barstow and Power for the purchase of Barstow's interest in the land; they averred that the proceedings by Power against Barstow, which resulted in Power's purchase, at sheriff's sale, of Barstow's interest, were adverse, without collusion, &c., with the sole purpose, on the part of Power, of collecting his claims.

4. They admitted Power made what was understood to be a "memorandum agreement" with William R. Fosdick, "Exhibit B.;" the agreement was not intended by either party to it, as a declaration of trust, nor was it to be recorded nor acknowledged; but was intended simply as a memorandum, that in case the land owned by Drayton and mortgaged to the St. Nicholas Bank, of New York, for $30,000, should be purchased by Fosdick, the two properties should then be conveyed to one person, in trust for the

purposes as averred, to facilitate a sale and raise a fund to discharge Barstow's liabilities to Power, which was more than the judgment of $18,666.55, mentioned in the agreement; if the interest of Drayton could be thus controlled, the proceeds from both properties were to be applied, first, to pay Power's judgments and the bank, pro rata, and the balance, if any, to the debts of Barstow; if Drayton's property could not be controlled, the agreement to be void. They admitted that the agreement was afterwards proved by a subscribing witness and recorded; but this was by mistake, without the knowledge or consent of Power. They averred that the Drayton interest could not be controlled by Fosdick, and therefore the consideration failed and it became void; that no creditor of Barstow, but Power, had anything to do with making the agreement, or any knowledge of it till after it was recorded. Fosdick was not then a creditor, nor authorized by any of Barstow's creditors, to make such agreement.

5. They denied that Power's judgment was fictitious, or ever intended as a cover or fraud; they averred that it was for money actually lent by Power to Barstow, and was but a small part of Barstow's indebtedness to him.

6. They admitted the proceedings in partition; the final judgment having been entered December 2d 1867.

7. They denied fraud in the sheriff's sale of 1868, on the arrears of the ground-rents, and that the purchase was made to Morrill at Power's request. They averred that it was not Power's fault that the ground-rents fell in arrear, but this resulted from the neglect of the Union Car and Manufacturing Company, by whom one-half of the arrears was payable—only one-fourth was payable by Power. He was always willing to pay his proportion, but the owners refused to receive a portion of the arrears, and the company refused to pay their share. Power had used his best efforts to save the property from waste or loss, and liability for ground-rents; he had paid for taxes, ground-rents, &c., more than $15,000, no part of which had the plaintiff, or any other creditor of Barstow, offered to refund; he had made efforts to have the ground-rents apportioned; the owners agreed to an apportionment, and the stockholders, on the 14th of April 1869, by a resolution, authorized the president to execute deeds for the purpose, but the president refused to do so; on the 1st of February 1870, the resolution was rescinded, with the avowed intention of embarrassing the defendants and others as to the property.

8. They averred that the alleged declaration of trust was not mentioned in the deeds from Morrill to Power, because it had become void, and was so considered by Fosdick and Power, the only parties to it, and because no claim could be set up, after the sheriff's sale, for the arrears of the ground-rent.

9. They denied that the consideration of the sale of the sheriff

to Morrill was paid by Power, or that he was reimbursed by the car company.

10. They denied that the conveyance of Power to Marston was made for any fraudulent purpose, or to avoid responsibility under the alleged declaration of trust; the conveyance was made in good faith for the consideration stated in the deed.

11. They denied that Power had refused to give all proper information to any one who had a right to ask it.

A replication was filed, and the cause was referred to William J. M'Elroy, Esq., as examiner and master.

A very large amount of testimony was taken; sufficient of it to an understanding of the case will be found in the extracts in the master's report and the opinion of the Supreme Court.

The master reported:—

" On the 1st of July 1864, John M. Reed was the owner of a tract of land, containing about 32 acres, on the west side of the river Schuylkill, in West Philadelphia, extending westwardly from that river across the Junction Railroad; subject to the ground-rents set out in the first paragraph of the bill. On that day he conveyed the portion of land east of the railroad, containing about 10 acres, to Caleb Barstow and John Egerton. On the 29th of July 1864, Reed conveyed the portion of the tract, west of the railroad, containing about 22 acres, to Barstow and Egerton; they on the 30th of July conveyed the 10 acres, east of the railroad, to the American Car Company. On the 20th of April 1865, Egerton conveyed his moiety of the western portion to Edward F. Drayton, who on the 25th of July 1865, mortgaged it to the St. Nicholas National Bank of New York, to secure the payment of $30,000. Barstow and Egerton, and all the parties in the case resided in New York. Barstow and Egerton erected buildings for manufacturing purposes on the 10-acre lot, but the enterprise proved a failure; the American Car Company, having become embarrassed in November 1864, Barstow and Egerton suspended. Power issued foreign attachments against Barstow and Egerton, out of the District Court of Philadelphia, under which the interests of Barstow and Egerton, respectively, on the 22-acre tract, was attached. Appearances were entered for Barstow and Egerton, and judgments were entered against them on the attachments, on the 10th of January 1866. Writs of venditioni exponas were issued in due time on these judgments, and the interests of Barstow and Egerton were separately advertised by the sheriff for sale on the 4th of June 1866. All these proceedings were adverse. There was no collusion or fraud between Barstow and Power in reference to any part of these proceedings; but they were instituted and conducted by Power, for the purpose of recovering his debt. H. R. Warriner, Esq., was of counsel with Power. On the 20th of May 1865, Barstow executed a bond, with warrant of attorney to con-

[Carhart's Appeal.]

fess judgment, conditioned for the payment of $120,000, to the American Car Company; on this bond judgment was entered May 22d 1865, in the District Court of Philadelphia. Thomas A. Gummey, Esq., was of counsel with the company. On the 22d of May 1865, Barstow executed another bond, with warrant, &c., conditioned for the payment of $75,000, to H. W. Barstow, W. P. Barstow, and J. L. Pope, trading as Barstow & Pope. On the same day, judgment was entered on this bond in the same court. W. H. Rawle, Esq. was of counsel with Barstow & Pope.

" On the 27th of May 1865, Barstow & Pope executed an assignment of their bond and judgment to a large number of persons, named in the assignment, in which the respective amounts appropriated to each was particularly set out.

" The assignment was prepared in New York and forwarded to Philadelphia to Mr. Rawle; it continued in his possession, but was not filed of record until April 24th 1871. No negotiations took place, in relation to the property between Mr. Power and the parties interested, until the 3d of June 1866, the day before that on which the property was advertised for sheriff's sale. On that day, a meeting was held at Mr. Rawle's office, at which were present, Mr. Rawle, representing Caleb Barstow and Barstow & Pope; Caleb Barstow ; Power, with his counsel, Mr. Warriner, and Barrett, secretary of the car company. It was expected that Mr. Gummey, of counsel with the car company, and Fosdick would have been present.

" It would appear from the parties present, and expected to be present, that the matters discussed had reference not merely to the property advertised for sale, as the Barstow moiety, but also to the Egerton moiety of the same tract which, also, was advertised for sale, and which had been conveyed by Egerton to Drayton, and by him mortgaged to the St. Nicholas National Bank, of which Mr. Fosdick was then president; and probably also to the property of the American Car Company, which was bound by the same ground-rents to which the Barstow and Egerton property was subject. Mr. Power says that the subjects discussed were in relation to the lines of the ground-rents, their apportionment, and the best manner of obtaining a good title to the property in the event of a sale; that no conclusion was arrived at and no definite plan agreed upon, but that it was thought best to sell under the ground-rents, as in that way a title would be obtained to both the Barstow and Drayton interests for the ultimate purpose of vesting them in one person, and thus facilitating a sale of the whole; that it was agreed, however, to postpone the sheriff's sale, as Mr. Fosdick, who was proposed as trustee for the purpose of private sale, was not present, and also in order to settle the manner in which the proceeds of such sales should be distributed. Mr. Rawle depends much for his recollection of the transactions of this meeting

[Carhart's Appeal.]

on a note written by him on the same day (and he thinks during the conference) to Mr. Gummey, in which he states that a suggestion had been made that the sheriff's sale should be postponed, and that Mr. Power and Mr. Fosdick should buy the property at the adjourned sale, and hold it for the benefit of the lien creditors; and, in a postscript, he further says: 'We have worked out the plan of making the title by a sale under the ground-rent, to which we all incline.' In this note he mentions a proposed meeting at Mr. Gummey's office on the next day, at which Mr. Fosdick would be present. There is no evidence to show that this proposed meeting was held.

"It is to be regretted that more definite evidence could not be obtained as to the details of this meeting of the 3d of June. No other person present, except those above named, was examined in reference to it. The lapse of time, and the complicated character of the interests involved, seem to have obscured the recollection of those who have testified. Indeed, Mr. Rawle says that he has no recollection of any precise word or sentence, nor even any exact subject of conversation at that interview, and that he should have utterly forgotten the interview, had not his memory been refreshed by the note written by him to Mr. Gummey.

"Upon the evidence given, my conclusion is that the meeting did not result in any definite agreement, except that the sheriff's sales should be postponed for the present. It resulted, however, in this, that an effort was afterwards made, looking to a consolidation of the two undivided moieties of the twenty-two acres in one person, for the benefit of the parties interested."

The executions were stayed. Power then commenced efforts to secure the co-operation of the parties, in order to unite the title of the two moieties in Fosdick, as trustee, to sell and distribute the proceeds. Fosdick's interest was as president of the St. Nicholas National Bank, mortgagee of the Egerton interest. Power, besides holding the judgment before-mentioned against Barstow, was a creditor to an amount exceeding $100,000. Power's negotiations were with Caleb Barstow, Barstow & Pope and Fosdick.

He did not consult with any of the persons in interest under the $75,000 judgment, except Marston & Power, nor with any other creditor of Barstow. Power was not aided in his efforts, by the counsel of any of the other parties, in Philadelphia. Mr. Rawle recollected several interviews with the counsel and their clients, and other parties interested, but had "no distinct recollection of any particular interview with any particular person, nor of anything that was said or done at any interview." He thought that the Hare ground-rent suit was brought at his request, Mr. Outerbridge, being of counsel, in pursuance of the plan adopted at the meeting of June 3d, but as to any connection of Power with it, it would be mere inference, connecting the plan proposed in the

[Carhart's Appeal.]

postscript of his note with the commencement of the suit, ten days afterwards. Judgment was obtained on the Hare ground-rent, July 9th 1866, and subsequently on the Powell ground-rent.

Executions were issued on the ground-rent judgments and the property was advertised for sale by the sheriff, on the 17th of September. On the 15th of September, Fosdick purchased the Hare judgment and it was marked to his use; on the day of the sheriff's sale, the Powell judgment also was purchased by him and marked to his use. His object was to secure to himself, the control of the sale of the American Car Company's property.

" I do not find from the evidence that anything was done by the counsel or parties, in Philadelphia, up to the last date mentioned, with reference to a consolidation of the Barstow and Egerton interests in this property, for the common benefit of the creditors concerned in it."

As the result of Power's efforts, a written agreement was prepared in New York, between Fosdick, Power, Caleb Barstow, Marston & Power, Barstow & Pope and The St. Nicholas Bank. It " Provided for a sale of the Drayton moiety under a foreclosure of the bank's mortgage, and for sales under the ground-rents and under the judgment held by Power against the Barstow moiety; that Fosdick should purchase all the property and take the title thereof free from all encumbrances, except the ground-rents, and hold the same in trust, and when the property should be disposed of, the amount realized should be appropriated, 1st, to reimburse him all expenses incurred; 2d, to pay and discharge all ground-rents and claims therefor; 3d, to pay pro rata the bank's mortgage and the judgments held by Power against Barstow and Egerton; 4th, to pay the bank all losses arising out of transactions with Barstow and Egerton; 5th, to pay pro rata the parties entitled under the judgment of $75,000, confessed to Barstow & Pope; 6th, to pay the Phœnix Warehousing Company the amount of checks and notes of Caleb Barstow held by that company; 7th, to pay all notes and checks of Caleb Barstow held by George F. Power and Marston & Power for confidential indebtedness; and 8th, to pay the general creditors of Barstow and Egerton."

This paper received the approval of Caleb Barstow and Henry W. Barstow on the 2d August 1866, and it was then submitted by Mr. Power to Mr. Fosdick, but the latter, acting under the advice of his counsel, declined to sign it, or to have anything to do with it. Caleb Barstow alleges that, notwithstanding this, both Mr. Fosdick and Mr. Power agreed to it verbally, and that pursuant to this understanding, they proceeded to Philadelphia, where Fosdick bought the property of the American Car Company, and Power bought the ground lying west of the Junction Railroad. As to any verbal agreement of this nature, Barstow is contradicted by both the others, and it is certain the written agreement had

no reference to the property of the Car Company. Mr. Fosdick says that his understanding was, that the paper submitted to him was a proposition made to him by Mr. Power to act in the matter as therein provided, mainly for the benefit of Mr. Power. The evidence does not show that any further attempts to come to an agreement were made in New York."

On July 13th 1868, Power was informed of the judgments for the ground-rents, expressed his satisfaction, and said he would see Fosdick, with whom, he said, he acted "in concert in this matter." Shortly afterwards, Mr. Warriner issued an execution on the judgments in foreign attachment against Barstow, and informed Power that the sheriff's sale would be made September 17th. The property of the Car Company was, at the same time, advertised for sale under various writs. Up to the 14th of September, no. definite arrangement had been made as to the disposition of the property.

The master then gives the conflicting testimony taken, as to any plan adopted on June 3d 1866, in reference to the disposition of the property; that on the part of defendants, tending to show that no arrangement had been made, as was alleged to be contained in the "declaration of trust," Mr. Rawle was unable to testify that he had seen Power or his counsel in September 1866, and said: "I have no memory whatever on the subject, except such a professional one as is made up more from inference than direct recollection." Mr. Rawle said that his recollection on the subject was vague and indefinite, that the interests were numerous and "more than proportionally complicated, and he cannot discriminate."

The giving of "Exhibit B." was proposed by Power; "it was entirely voluntary on his part; there was no present consideration for it; it was not sealed or acknowledged; it was not to be recorded, but left in the care of Mr. Gummey, to be held by him merely as a memorandum, and its use, as an executed paper, was dependent upon a contingency, namely, that the undivided moiety of Drayton in the property could be purchased or controlled and the interests of Barstow and Drayton consolidated in one person."

The sheriff's sale took place on the same day (September 17th 1866), after signing the paper, and Power bought Caleb Barstow's moiety for $1000. At the same sale Fosdick bought the property of the Car Company for $10,000, and afterwards sold it to the Union Car and Manufacturing Company, who owned it at the time the bill was filed. Judgment was afterwards obtained for arrears of the Powell ground-rent, which fell due October 1st 1866; the sale was advertised for February 4th 1867; on that day the judgment was marked to the use of Fosdick and he stayed the sale. On the 2d of February, Fosdick had instructed his counsel, Mr. Gummey, to have the agreement (Exhibit B.) recorded, and Mr. Gummey, being one of the subscribing witnesses, proved its

execution and had it recorded .the same day; this was done without the knowledge of Power, and was a violation of the oral agreement made when "B." was signed. Fosdick's purpose was to thwart Power in his efforts to obtain the Drayton interest, and to consolidate the two moieties for the purposes of the agreement of September 17th 1866. Power had not shown any intention to escape from the terms of the agreement, but endeavored to carry it into effect. He commenced proceedings in partition, March 9th 1867, and whilst they were pending, Fosdick issued a scire facias on the St. Nicholas Bank mortgage, and obtained judgment May 25th; a levari facias was issued June 12th; judgment *quod partitio fiat* was obtained June 15th. The Drayton interest was advertised for sale under the levari on the 1st Monday in July. A writ of partition was issued returnable on the 1st Monday in August. There were negotiations for arranging matters between Power and Fosdick, without success.. At the sheriff's sale, Power bid $40,000, but the counsel for the bank, under Fosdick's instructions, stayed the sale, much to Power's dissatisfaction. In the partition suit, purpart "C" was adjudged to Power. The remainder of the 22-acre tract was allotted to Drayton, and the partition was confirmed December 2d 1867. Under a pluries levari the purpart of the 22 acres allotted to Drayton was sold by the sheriff March 2d 1868, to Peter Borland, for $5000; on May 20th 1868, Borland conveyed to W. H. Marston, who was a partner with Mrs. C. W. Power, wife of the defendant Power, under the firm name of Marston & Power. On the 20th of July a judgment was obtained for the arrears of the Powell ground-rent, and under it the portion of the property No. 1, owned partly by Power and partly by Marston, was sold by the sheriff to Edward W. Morrill for $1500. On August 24th 1868, judgment was obtained for the arrears of the Hare ground-rent, and under it, properties 1 and 2, being the portion of the 22 acres then owned partly by Power and partly by Marston, were sold by the sheriff, October 5th 1868, to Morrill, who, on the 14th, conveyed to Power the premises formerly owned by him, and to Marston the premises owned by him, the consideration in each case being $5000, and on the 15th, Power made a mortgage for $66,000 on the part of the premises conveyed to him by Morrill, to the Bank of Fairhaven, Massachusetts, which had previously issued a foreign attachment.

Barstow and Pope had not been informed of the contents of the agreement of September 17th 1866 (B.), on the 6th of December 1866. About a year later, Spaulding and Richardson for Brett, Son & Co., who were among the assignees of the $75,000 judgment, having written to Mr. Rawle, learned of its existence and of its having been recorded. Upon inquiry by them of Mr. Rawle, at his request Mr. Gummey drafted an answer, in which he spoke of the paper of September 17th 1866 as a declaration of trust. Mr.

Rawle made some modifications in Mr. Gummey's letter.  He added to the letter, that an estimate of $150,000 for Mr. Power's moiety was based on a careful management of the property for some years, and that it was doubtful whether at a forced sale it would bring one-sixth of that estimate, that the property had always been unlucky, although it was valuable and directly opposite the heart of the city, near the Schuylkill.  None other of the parties interested in the $75,000 judgment, made any inquiries or received any information, &c., as to the paper of September 17th 1866, except the testimony given by Mr. Rawle with regard to his knowledge.

"As respects this, he states that he cannot swear that he was present at its execution, or indeed that he ever saw it, but he thinks it very probable; that his recollections and belief are that he either saw the paper itself or knew of its purport at the time of its execution.  He thinks he did not first hear of this paper when informed of it by the correspondence with Spaulding & Richardson in December 1867, and he should say that he first knew of its existence on the day of its date, yet it may have been when Mr. Gummey came to him and told him that he had this paper, and that Mr. Warriner and Mr. Power had entirely forgotten it.  This was on or after February 2d 1867.  Mr. Rawle gives his reason for believing that he either saw, or knew the purport of the paper at the time of its execution, that otherwise he would have done everything to prevent the sheriff's sale on that day, or, failing in that, would have called on the assignees of the $75,000 judgment, whose lien would be divested by that sale, to come forward and protect themselves.  In another part of his testimony, when asked whether it was not in consequence of instructions or requests received from Caleb Barstow rather than from any agreement or understanding with Mr. Power, that he suffered the sheriff's sale to proceed, he answers by referring to a letter from Barstow of September 14th 1866, and states that this letter will better answer the question than he can do from mere memory.  He states further, that at this lapse of time, and in a case in which there were so many complications and alterations of plans, it is with reluctance that he testifies positively as to more than a few salient points.  These points, as to which he has a distinct recollection, he gives as follows: 'The circumstances attending my first interviews with the Barstows and Mr. Gummey, and the transactions of May 1865, the fact of the interview of June 3d 1866, of which the result was given in my note and postscript of that day; the fact of Mr. Fosdick and his counsel, Mr. Gummey, professing from beginning to end a warm friendship for Mr. Barstow, and desire to promote his interests; of Mr. Power's desire to get his money, and subsequently coming in with Mr. Fosdick to help Mr. Barstow; the sheriff's sale of October 1868, being made in furtherance of this

end, and the events of the last few weeks in this cause, which have developed in the present turn which it has taken—these are the salient points as to which my memory is quite positive.' "

The master further reported that the charges that the judgments mentioned in the fifth paragraph of the bill were fraudulent and were not sustained.

" The main issue, as raised by the pleadings is, whether the trust alleged to exist by virtue of the said agreement, was or was not a trust perfectly created. * * * Looking at the instrument by which the trust is alleged to have been declared in this case, it is evident that no consideration appears by it to have moved to Mr. Power, the person executing it. Nor is there any evidence to show that he received any valuable consideration from any person whatever. The testimony shows that it was proposed by him, and executed voluntarily by him, without consideration and without request from any one. It appears also not to have been sealed. The subscribing witnesses only attest the signing, not a sealing or delivery. It was not acknowledged for the purpose of recording, and the evidence is, that when Mr. Power left it with Mr. Gummey, it was with the understanding that it should not be recorded. The subsequent proof and recording of the paper by Mr. Gummey, under direction from Mr. Fosdick, was a clear violation of this understanding, and without any authorization from Mr. Power. It is also evident that Mr. Power was not, at the time of its execution, the owner of the subject-matter of the trust. It states an intention to purchase certain real estate, which, if purchased by him, is to be held in trust. It was not, therefore, strictly speaking, a perfect trust, for something was to be done by him to give it effect, namely, the purchase of the property. Further, he does not, in the instrument, specify himself as the trustee. * * * The proper construction of this paper appears to me to be, that Mr. Power did not by it intend to declare a present trust in himself with respect to the property about to be purchased by him, but that the property, if purchased by him, should afterwards, as soon as the Drayton moiety thereof could be controlled, be conveyed to some trustee to be selected, who should hold both interests, being the entire property, in trust for the purposes mentioned in the instrument. * * * It seems to me, therefore, from the paper itself, and from the circumstances attending its execution, the condition of the property and the relation of the parties, that the purpose in view by Mr. Power was not so much the application of the Barstow moiety in the lands in question to the payment of the debts mentioned, as to secure the application of the Drayton moiety also for this purpose, and the consolidation of both moieties in order that the whole property might be made available for the payment of the indebtedness of Barstow. * * * After an attentive consideration of all the evidence on this subject, I have come to the conclusion that Mr.

Power did not intend to create a distinct and independent trust in himself as to the moiety of Caleb Barstow in the land in question, but that the trust proposed by him was one that should embrace both moieties, and was dependent for its existence upon the securing of the title to the Drayton moiety in said land by some one who would bring it within the trust, and agree upon a trustee to whom the entire property could be conveyed. * * *

"In regard, therefore, to the question of the existence of an express trust in Mr. Power, as respects the property mentioned in the bill, I report that no such trust exists, and that the agreement of September 17th 1866 (Exhibit B.), did not create a trust of the said property, but was a mere voluntary agreement to create a trust of that moiety of the property and the moiety held by Edward F. Drayton, when the Drayton moiety could be controlled and the two interests consolidated in one trustee, and that this event has not occurred. * * *

"The question remains to be considered whether Mr. Power, although not a trustee of this property by direct trust, is a trustee thereof, as respects the holders of the $75,000 judgment, by implication or *ex maleficio*. No charge of this kind is made by the bill, but evidence directed to this point was received without any objection being made by defendants, and it becomes my duty to consider and report upon it. * * * I have considered the evidence in this case very carefully wherever it be as upon the point now in question and my difficulty in respect to it is, that although there is proof of an effort having been made to come to some definite agreement or arrangement with respect to this property for the benefit of creditors interested in it, yet I cannot find evidence that establishes such an agreement between Mr. Power or Mr. Fosdick and any of these creditors as having ever been actually made. Nor do I find that there is satisfactory evidence that either of them made any promise to Mr. Rawle, or any of the creditors secured by the judgment, or to Barstow & Pope, or to any other creditor of Caleb Barstow, that he would purchase the property and hold it for the benefit of creditors, and that by reason of any promise of this kind, or any other inducement, any of the creditors was prevented from bidding, or did not bid, at the sale. * * *

"I feel, therefore, compelled to report that I do not find it established by the evidence that the defendant, Power, or any one authorized by him, made any promise or agreement with respect to the purchase of this property by him, by which any creditor of Caleb Barstow was led to forbear doing what he contemplated, by bidding at the sheriff's sale or otherwise, with respect to the property in question. * * *

"I now report that the prayer of this petition should not be granted; and upon a consideration of the whole case, I respect-

28 P. F. SMITH—8

[Carhart's Appeal.]

fully submit to the court that a decree should be entered, dismissing the plaintiff's bill, with costs."

After exceptions to the master's report, it was confirmed, and the bill was dismissed, with costs.

The plaintiffs appealed to the court in banc.

*J. J. Murphy* (with whom were *F. Sheppard and H. Wharton*), for appellants.

*D. C. Harrington,* for appellees.

Mr. Justice WOODWARD delivered the opinion of the court, May 10th 1875.

It is indispensable to the success of the plaintiffs in this suit, that the instrument executed by George F. Power on the 17th of September 1866, the day of the sheriff's sale of the property of Caleb Barstow, should be connected with the agreement alleged to have been made between Power and the other creditors of Barstow, on the 3d of June 1866, at the office of Mr. Rawle. A large mass of details, tending to establish such a connection, was presented to the master. The whole history of the efforts of the creditors to collect their debts, and of the legal proceedings employed for that purpose, from the time of Mr. Barstow's failure, was disclosed. But the general evidence was of a character to corroborate and strengthen direct testimony of the essential fact, rather than to afford independent proof of its existence. At the last, the disposition of the questions in dispute must depend upon the statement of Mr. Rawle. From the multiplied details that are grouped in the record around the main point of dispute, it is believed that if he had been able to say, from a distinct recollection, that the agreement of the 17th of September was the execution of the agreement of the 3d of June, the duty of the master would have consisted in finding the allegations of the bill sustained. There is, fortunately, no embarrassment in dealing with his testimony. Just what he meant to say was said in unmistakable and distinct terms, and the exact extent of his knowledge, and the precise limits to which his recollection went, were accurately defined.

In his examination in chief, Mr. Rawle said: "If I remember rightly, the projected sheriff's sale was the result of an arrangement, and was not what is commonly called an adversary proceeding. Besides, the fact that the property was held in common with John Egerton, who was not only supposed to be affected in his mind, but had made a peculiar conveyance to his brother-in-law, there were complications as to the Barstow moiety which it was thought this sale would correct, and all parties were acting in harmony and for the benefit of the Barstows, for whom much sympathy was felt. All considered that if properly managed and nursed, the property would not only pay its debts, but leave a

[Carhart's Appeal.]

handsome balance to the Barstows. It was therefore agreed by all, that instead of my bidding up the property so as to protect the $75,000 judgment, after the payment of Mr. Power's judgment and the arrears of the ground-rent, which I think were due, Mr. Power should become the purchaser at the sheriff's sale, and should hold the property after its purchase in trust, 1st, to pay his judgment; 2d, to pay my $75,000 judgment; and 3d, to pay the Barstow creditors. Such an agreement was reduced to writing, signed by Mr. Power, and witnessed by Mr. Gummey and Mr. Warriner, on the day of the sale. * * * The paper to which I have referred, as executed by Mr. Power, is Exhibit B. of the bill. I cannot swear that I was present at its execution; or, indeed, that I ever saw it, but I think it very probable. Until the night before last, when, for the first time, I carefully read the answer in this case, and when, for the first time, I saw all the evidence, I had never known that the effect and validity of that instrument depended on any contingency whatsoever, or that it meant anything other than what was expressed on its face. Had it been so, my course of action would have been very different. * * * I have already said that the averment in the answer that Exhibit B. was not intended by either party as a declaration of trust; that it was not intended to be recorded; that it was recorded through a mistake; and that it was dependent for its validity upon the purchase of Mr. Fosdick, or any one else, of other property, there or elsewhere, or upon any contingency whatsoever, struck me with the greatest surprise. In all the numerous interviews with all these parties and their counsel, no such suggestion was ever made or intimated. I never heard of it before."

If the testimony of Mr. Rawle had closed at this point, it would probably, in its connection with the statements he had made of the result of the meeting of creditors in his office, with the terms of the paper in question, and with the voluminous corroborative proofs produced before the master, have been controlling in the decision of the cause. But it is clear from his answers on the cross-examination, that his impressions were derived from his participation in isolated transactions, and that he had not kept himself familiar with the current details of the proceedings in the interval between the meeting in June and the sale in September. In answer to the question whether his interviews and conversations with Mr. Warriner were not confined to the subjects of the American Car Company's property, and the ground-rents binding this and other property, Mr. Rawle said : " It is impossible for me to say. The interests were very numerous, and more than proportionally complicated, and I cannot discriminate." He was unable to say positively whether he had ever met Mr. Power before the meeting of the 3d of June 1866; he could not say whether that meeting referred to in his note to Mr. Gummey, was

in reference to the Car Company's property; he could not say who were present on that occasion; and he stated that he should have utterly forgotten that interview if his memory had not been refreshed by that note. He added: " The first line of the note is, ' we are all sorry,' &c. Who the ' all' were I cannot now say. Possibly, Mr. Aaron Thompson, who represented a judgment, and probably one of the Barstows. I think it unlikely that there were only Mr. Power and our two selves," ( Mr. Warriner and the witness). In answer to a subsequent question, whether he could now state from recollection that the conversation was on any subject other than the ground-rents, he said: "I cannot answer more particularly than I have already done. I have no recollection of any precise word or sentence, nor even the subject of conversation at that interview. Referring to my note, I see that it says, ' Mr. Fosdick will be here to-morrow,' so that, of course, he was not at that interview." He could not remember when he next saw Mr. Power, nor whether he met him until after the sheriff's sale in September 1866. He said that to the best of his recollection he saw him on the day when Exhibit B. was executed, but was not certain, and could mention no circumstance other than the general facts he had stated, which induced him to believe he saw Mr. Power that day. He could not remember whether Mr. Power and Mr. Fosdick had called on him together at any time on business, and thought they might have called often, and might never have called at all. In answer to the question, whether he had anything to do with the ground-rent suit brought by Mr. Outerbridge, he said his answer would be a mere matter of inference, connecting the agreement or plan referred to in the postscript of his note with the commencement of the suit ten days afterwards. His recollection, he said, was that of a professional man who remembers results, and sometimes that which led to them, without being able to identify those antecedents. So far as his recollection was distinct, however, he stated that his knowledge of Exhibit B. was not derived purely from hearsay, but from the paper itself. No steps were taken by him to enforce the trust, as he felt that Mr. Gummey had the matter primarily under his charge. In a later stage of the cross-examination, in answer to the question, " Can you say that you saw Mr. Power or Mr. Warriner in September 1866, in relation to these matters," he said, "I can neither affirm nor deny your question, I have no memory whatever on the subject, except a general professional one, which is made up more from inference than direct recollection."

On the part of the defendants, the whole theory of the plaintiffs that the instrument executed on the day of the sheriff's sale was to be treated as having been made in pursuance of an agreement entered into in the previous June, was contested from the outset.

The evidence they gave tended to show that the stipulations the paper contained, were agreed upon at the time of its execution; that Mr. Power and Mr. Fosdick were the only parties to it; that when it was signed no persons were present except Messrs. Power, Fosdick, Gummey and Warriner; that the consideration of the agreement for the creation of the contemplated trust was to move from Mr. Fosdick, and that the consideration subsequently failed. If this evidence exhibits the true state of the facts, and the master has found it to be entitled to full credit, it is clear that the plaintiffs cannot hold the defendants liable to account to them by reason of the existence of any such trust as the bill asserts.    The plan of action, whatever it may have been, which was settled on the 3d of June, must have been materially modified before the 17th of September 1866.    No sales were made on any ground-rent judgments until the autumn of 1868, when the property (embracing both the Barstow and Drayton moieties) was purchased by Mr. Morrill.    The sheriff's sale of 1866 was made on a judgment against Mr. Barstow, which Mr. Power had obtained in the June Term of that year in the District Court.

That Mr. Barstow was active in promoting some arrangements by which, after satisfying his creditors, something could be saved out of this property for himself, and that he hoped, to secure this result through the aid of Mr. Fosdick and Mr. Power, is sufficiently obvious.    This appears from the whole tenor of his correspondence, and especially from the terms of his letter to Mr. Rawle, of the 14th of September 1866.    But the facts found by the master show that he was not a party to the agreement made on the day of sale, and the evidence indicates that he had no personal knowledge of it.    There were obvious reasons why his general creditors in New York would not have been likely to interfere.    His interest in the property was an undivided moiety, and was encumbered to the extent of $235,000.    Its value, at the time of these proceedings, was purely conjectural.    In December 1867, after the partition had been completed, Mr. Rawle wrote to Messrs. Spalding and Richardson, that the whole property had then been recently estimated at $300,000, making the value of the Barstow moiety $150,000.    "But," Mr. Rawle added, "this estimate is based upon the careful management of the property for probably several years to come.    It might be doubtful whether, at a forced sale, it would bring one-sixth of this estimated value. The property has always been unlucky, though it is valuable, and directly opposite the heart of the city, near the Schuylkill."    In this connection, as showing the probable relation of the New York creditors to the transactions by which the title was vested in Mr. Power, a passage in the letter from Messrs. Vose and McDaniel, to Mr. Rawle, dated the 21st of April 1871, is significant.    They wrote as follows:  " If this property has really become valuable,

and you, after investigation, think money would result from resisting Power and the other people, we might get the parties interested to arouse themselves for a fee." The letter from Messrs. Barstow & Pope to Caleb Barstow, written on the 6th of December 1866, affords ground for a legitimate inference that both they and he were in ignorance of the actual arrangement under which the sale had been made in September. It said: "We infer from what you have confidentially communicated to us, that some sort of reciprocal understanding exists between Mr. George F. Power and Mr. W. F. Fosdick. * * * We infer from what you have said as to those two gentlemen being checks on each other, that Mr. Fosdick's purchase of the American Car Company, was to cover payments he has made, including the satisfying of certain judgments then hanging over the company; also, to pay certain obligations secured by hypothecation of the certificates of the stock of the car company, and then any remaining balance to go towards the payment of the debts of yourself and John Egerton, in such manner as Mr. F. may find advisable. Now, this is probably all very well, but in view of the uncertainties of life, these matters had better be thrown into a safer form. We should, for instance, like to have Mr. Power execute a deed of trust in favor of Mr. Fosdick, as was originally contemplated, declaring the nature of his purchase, and authorizing Mr. Fosdick to act as trustee, and follow out the payment in the order that was originally contemplated, commencing with Mr. Power's judgment of $19,000 to $20,000, and so on to the end, and have such writing put on record in Philadelphia, according to law." It is scarcely credible that such a letter would have been written, if Caleb Barstow, or Barstow & Pope, for whom Mr. Rawle had acted as counsel, had been aware of the existence of the agreement which Mr. Power had executed less than three months before.

No distinct evidence—none that would intelligibly define the rights of any of the parties—was given before the master as to any specific terms agreed upon, or any specific interests to be affected at the meeting on the 3d of June 1866. The view of the plaintiff as to the effect of the agreement then made, could be supported only by affirmative proof that, in pursuance of that agreement, the paper of the 17th of September, was executed by Mr. Power. Such proof has not been made, and the evidence of the defendants, direct and circumstantial, supports the conclusion which the master reached, that the transaction was exclusive of any participation by the general creditors of Mr. Barstow, and independent of any action they had taken.

If the proceedings resulting in the sheriff's sale were adversary as to all parties except Mr. Fosdick, and the consideration for the agreement which Mr. Power executed emanated solely from him, it is manifest that no duty was created by the agreement towards

the general creditors of Mr. Barstow, that can be now enforced. As to them, the instrument was voluntary. It stipulated that, on the happening of certain contingencies, a trust should be declared, and the contingencies did not happen. "A trust will be executed wherever there is a valuable consideration; but where the settlement is merely voluntary, it is commonly supposed that to attract the jurisdiction of the court, there must be what is called a transmutation of the possession—that is, the legal estate must be put out of the settlor; but, perhaps, upon examination of the authorities, the validity of the trust will be found to resolve itself into the question whether or not the trust was at first perfectly created:" Lewin on Trusts 110. In Ellison *v.* Ellison, 6 Vesey 662, Lord Eldon said: "If you want the assistance of the court to constitute you *cestui que trust*, and the instrument be voluntary, you shall not have that assistance; as, upon a covenant to transfer stock, if it rest in covenant and be purely voluntary, the court will not execute it; but if the party have completely transferred stock, though it be voluntary, yet the legal conveyance being effectually made, the equitable interest will be enforced in this court." The same rule is applied to imperfect gifts, not testamentary, *inter vivos*, to imperfect volunteer assignments of debts and other property; to voluntary executory trusts; and to voluntary conveyances: 1 Story's Eq., sect. 793-6. "Unless the contract has been founded on a valuable or other meritorious consideration, or what is so considered in a court of equity, as the payment of debts, a specific performance will not be decreed. In general, a court of equity will not interfere to carry into effect unexecuted voluntary contracts *inter vivos*, but will leave the parties to their remedies of law:" Brightly's Eq., sect. 244; Yard *v.* Patton, 1 Harris 285; Read *v.* Robinson, 6 W. & S. 331. An executory contract must have a consideration to support it, without which equity will no more execute it than the law would make the breach of it the subject of compensation: Brightly's Eq., sect. 244, citing Kennedy *v.* Ware, 1 Barr 450; Campbell's Estate, 7 Barr 100, and Greenlee *v.* Greenlee, 10 Harris 235.

The remaining question is subsidiary to that which has been discussed. The master has found, as a fact, that no fraud was practised by Mr. Power in the purchase of the property. He made no promise by which any creditor was deceived, misled, or induced either to act or to forbear action. A simple avowal of acquisition for the use of another, whether made cotemporaneously with or subsequently to the fact, will not of itself support an allegation of a trust: Robertson *v.* Robertson, 9 Watts 32. The later propositions and negotiations between the parties cannot stand in the place of proof of some distinct fact requisite to fix on Mr. Power the responsibilities of a trustee. "An attempt to create and enforce a specific trust," it was said by Mr. Justice Washington, in

Slocum *et ux. v.* Marshall, 2 Wash. C. C. 397, "from the loose
expressions of parties made at different times and on different
occasions, would be inconsistent not only with the spirit and
policy of the Statute of Frauds, but with the general rules of
evidence." Owing no duty to Mr. Barstow's creditors, and, so far
as they were concerned, dealing with the property as his own,
Mr. Power was subject to no imputation of bad' faith, and the case
before the master was not one requiring that he should be held
accountable as a trustee *ex maleficio*, at the instance and for the
benefit of the present plaintiffs.

.The evidence before him justified the master in finding that the
conveyances of the Drayton moiety of the land, by Borland and
Morrill to Marston, were made in good faith and independently of
any ownership, interest or control of Mr. Power; and in finding
that the allegation in the bill that the conveyance from Power to
Marston of the 16th of October 1868, was made for fraudulent
purposes, was unfounded. Indeed, it is believed that the rulings
of the master were essentially accurate throughout his comprehen-
sive and satisfactory report.

Decree affirmed and appeal dismissed, at costs of appellant.